STATE of Utah, Plaintiff and Appellee,

v.

Nealy W. ADAMS, Defendant
and Appellant.

No. 960092–CA.

Court of Appeals of Utah.

April 2, 1998.

Gregory G. Skordas, Lloyd R. Jones, and Brett J. DelPorto, Salt Lake City, for Defendant and Appellant.

Jan Graham and Joanne C. Slotnik, Salt Lake City, for Plaintiff and Appellee.

Before DAVIS, P.J., and BILLINGS and JACKSON, JJ.

## OPINION

BILLINGS, Judge:

Nealy W. Adams appeals from a conviction of forcible sexual abuse in violation of Utah Code Ann. § 76–5–404(1) (1996). We affirm.

## FACTS

In 1993, Adams began a relationship with Virla Hess and soon moved into Virla's home, where she lived with her thirty-four-year-old Downs' Syndrome daughter, Carleen. Carleen functions at the cognitive level of a three-and-a-half-year-old.

About a year after he moved in with Virla and Carleen, Adams, who was a regular drinker, began to drink more heavily. Occa-

sionally Adams would become so inebriated that he could not remember the next morning what he had done while he was drunk. During this time, Virla noticed Carleen was more reclusive and that she began taking her meals into her room.

After Adams had lived with Virla for almost two years, the relationship began to deteriorate. Adams was frequently drunk, and the couple argued bitterly. One night in 1995 at about 1:30 a.m., Virla awoke to a loud bang, followed by the sound of breaking glass coming from Carleen's room. When she went to investigate, she found a broken clock and saw Adams, naked, emerge from Carleen's room with his pants in his hand. Adams later said he could not remember anything that happened that night, but he did recall Virla talking to him about the incident the next morning.·

A few weeks after this incident, the couple agreed that Adams should leave the house. When Virla told Carleen that Adams was moving out, Carleen said that Adams had been molesting her. Four days after Adams had removed all of his belongings, Virla contacted the police and reported the alleged abuse.

Detective DeHart interviewed Carleen at her home, in Virla's presence. Adams was later charged with one count each of rape and forcible sexual abuse. A jury acquitted Adams of the rape charge and convicted him of forcible sexual abuse. Adams now appeals.

## ANALYSIS

### I. Competency of Witness

■■■ Adams initially argues his trial counsel was constitutionally ineffective because counsel failed to. object to Carleen's testimony on the ground that she was incompetent. To prevail on an ineffective assistance of counsel claim the defendant must show " 'counsel's representation fell below an objective standard of reasonableness.' "

State v. Templin, 805 P.2d 182, 186 (Utah 1990) (quoting Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). The defendant must also show "a reasonable probability exists that except for ineffective counsel, the result would have been different." State v. Lovell, 758 P.2d 909, 913 (Utah 1988).

■■■ Under Utah law governing competency of witnesses, Adams's trial counsel did not err by failing to request a competency hearing. In Utah "[e]very person is competent to be a witness except as otherwise provided in these rules." Utah R.Evid. 601(a). "This language was intended to abolish age, *mental capacity,* and other grounds which used to render a person incompetent as a witness." State v. Fulton, 742 P.2d 1208, 1217 (Utah 1987) (emphasis added). The current version of Rule 601 has "completely altered the law with respect to witness competency." Id. Thus, under current Utah law, all witnesses, even mentally deficient witnesses, are presumed competent.

Adams points to several of Carleen's mental deficiencies as evidence she was clearly incompetent to testify, including that she could not spell her name, count past twenty-nine, or correctly identify her belly button, knee, or vagina. However, while this evidence shows Carleen functions well below normal, it does not show she was unable to appreciate the need to tell the truth or that she was unable to relate information to others. We therefore conclude counsel was not ineffective for failing to request a competency hearing.

### II. Admission of Testimony on Whether Victim Had Been Coached

#### A. Dr. Hawks

■■■ Adams argues the prosecution failed to establish proper foundation for Dr. Hawks's testimony regarding whether Carleen was capable of being coached.[1] Accord-

---

1. Adams also claims that Dr. Hawks's testimony violated Rule 608(a) of the Utah Rules of Evidence. We disagree. The defense put Carleen's credibility at issue and Dr. Hawks did not state whether he believed Carleen was telling the truth about the abuse. We conclude the testimony did not go to whether Carleen was telling the truth when Dr. Hawks interviewed her, and thus disagree with the dissent. Unlike the expert witness in *Rimmasch,* Dr. Hawks merely stated it was his opinion· she did not have the cognitive ability to be coached.

ing to Adams, Dr. Hawks's testimony did not meet the reliability requirement established in *State v. Rimmasch,* 775 P.2d 388 (Utah 1989).

> *Rimmasch* ... sets forth a three-part standard for admitting scientific evidence under Utah Rule of Evidence 702. *Rimmasch* first requires a threshold showing of inherent reliability. A proponent may either show a general acceptance of the principle or technique in the relevant scientific community or proffer a sufficient foundation to demonstrate the inherent reliability of the underlying principles and techniques....

> If the proponent can satisfy this threshold requirement of inherent reliability, only then need the court consider the remaining two steps. *Rimmasch*'s second requirement is a "determination that there is an adequate foundation for the proposed testimony, i.e., that the scientific principles or techniques have been properly applied to the facts of the particular case by qualified persons and that the testimony is founded on that work."

> Finally, if the court is satisfied regarding this second determination, it must balance the probative value of the proffered evidence against the dangers its admittance poses under rule 403 of the Utah Rules of Evidence. *Rimmasch* also points out that "when the inferences from the scientific evidence sweep broadly or cut deeply into sensitive areas, a stronger showing of probative value should be required. Such a 'sensitive area' is one central to the core of the fact-finding process—whether one witness or another is telling the truth."

*State v. Brown,* 948 P.2d 337, 340–41 (Utah 1997) (citations omitted) (quoting *Rimmasch,* 775 P.2d at 398, 399 n. 8). In applying the *Rimmasch* standard, it is helpful to review Dr. Hawks's entire testimony regarding whether Carleen could have been coached:

> Q. ... Could your evaluation and expertise tell you whether [Carleen] was sophisticated enough to make up the story that was alleged here?

> A. And, of course, as I mentioned, that's one of the things we deal with all the time, did somebody coach you—

> [DEFENSE COUNSEL]: And at this point, Your Honor, I'm going to object to his answering that until there's further foundation. What he's talking about now I don't believe—he's gone into his examination of her testifying truthfully in this case. That, again, is the prerogative of the jury. I think it's improper.

> THE COURT: Well, I think the form of the question is different and he has given some background. The objection is overruled.

> A. In my opinion, that's a difficult question and surely I couldn't answer that 100 percent positively; however[,] it would seem that someone who—in the school system who has been taught in special ed and resource classes[,] and she's 34, I believe[,] and if all those years of special ed and resource classes couldn't get her to even write her name correctly, couldn't get her to ... count past number 50 or say the alphabet, that I'd have trouble—it would be difficult for me to assume somebody could coach her, even if they tried, to consistently report anything, you know, even their birthday. I mean, she was inaccurate in giving her birthday. She struggled with that.

> So I find it troubl[ing] if—if she has difficulty in doing, you know, second and third grade level, that I would—I'd have real trouble to see anybody[—]a mother or me or the school system[—]if they can't do it with counting, how could—I ask myself, could someone do it with persuasion or threats to[,] to get her to consistently across two interviews spontaneously talk about some sexual activities that occurred.

> So in my opinion, that's probably not likely.

■ We must first determine, then, whether the information upon which Dr. Hawks based his opinion was inherently reliable. Before Dr. Hawks answered the prosecution's question regarding whether Carleen could have been coached, he testified extensively about Carleen's educational background and training. Dr. Hawks further

testified regarding the WAIS–R test he administered to determine Carleen's Intelligence Quotient and the Vineland test to determine her functioning ability. According to his testimony, the WAIS–R has been administered since the 1950s and the Vineland has been administered for a similarly long period, having been revised in the 1980s. These scientific methodologies clearly meet the inherent reliability requirement of *Rimmasch.*

■ As for the second foundation requirement of *Rimmasch,* we conclude Dr. Hawks's testimony satisfies the mandate that "the scientific principles [must] ... have been properly applied to the facts." *Rimmasch,* 775 P.2d at 398. Dr. Hawks opined that, based on Carleen's very limited cognitive abilities, it was unlikely that she could successfully be taught to repeat a fabrication over time. By so testifying, Dr. Hawks provided "specialized knowledge" to help the trier of fact determine whether Carleen had the mental capacity to render Adams's theory of the case possible. *Cf. State v. Teeter,* 85 N.C.App. 624, 355 S.E.2d 804, 808 (1987) (concluding expert's opinion based on experience in treating sexually abused mentally retarded persons, familiarity with research in the field, and personal examination of victim was helpful to jurors in understanding evidence and therefore admissible under Rule 702); *State v. Oliver,* 85 N.C.App. 1, 354 S.E.2d 527, 533–34 (1987) (holding expert testimony was helpful to trier of fact in assessing credibility of mentally retarded victims who reported sexual abuse and thus was admissible under Rule 702).

■ Furthermore, unlike the expert in *Rimmasch,* Dr. Hawks based his opinion on the cognitive testing and functional analysis he had made of Carleen's particular mental capacity. Dr. Hawks did not make a subjective credibility determination that Carleen was telling the truth about the abuse. *See State v. Braun,* 787 P.2d 1336, 1338 (Utah Ct.App.1990) (discussing categories of impermissible testimony delineated in *Rimmasch* ); *accord State v. Kallin,* 877 P.2d 138, 140 (Utah 1994). Rather, Dr. Hawks merely opined that—based on the objective information regarding Carleen's abilities he obtained

by testing Carleen or by reviewing her educational records—Carleen would probably be unable to repeat a made-up story on two separate occasions. Therefore Dr. Hawks's testimony satisfied the final *Rimmasch* standard because its probative value outweighed its potential for prejudice.

### B. Detective DeHart

Adams next argues the trial court improperly allowed Detective DeHart to testify regarding whether Carleen had been coached. Adams points to the following exchange as the source of error:

Q: Ok. Did it appear to you at all that Carleen was coached?

A: No it did not.…

Q: Basically, has she been consistent or inconsistent with her story?

A: The story that she tells is consistent with the original story that she told me.

■ Defendant did not raise this issue below and thus we apply the plain error test. To prevail under this standard, a defendant must show 1) an error occurred, 2) the error was obvious, and 3) the error was harmful. *See State v. Dunn,* 850 P.2d 1201, 1208 (Utah 1993). An error is harmful if "absent the error, there is a reasonable likelihood of a more favorable outcome" for defendant, or if the appellate court's "confidence in the verdict is undermined." *Id.* at 1208–09.

Adams relies primarily on *State v. Stefaniak,* 900 P.2d 1094 (Utah Ct.App.1995), to support his claim that admission of Detective DeHart's testimony constitutes reversible error. In *Stefaniak,* this court held a witness's testimony that the victim "volunteered information readily" and "seemed to be quite candid about what she was telling me" was improper bolstering of the witness's character in violation of Utah Rule of Evidence 608(a). *Id.* at 1095–96. The court further concluded the error was prejudicial and warranted a retrial because " 'this case depended on the jury's assessment of the victim's credibility versus the defendant's, and there is not "other evidence [to support] the defendant's conviction" ... beyond that which is tainted by ... improper testimony.' " *Id.* at 1096

(alterations in original) (quoting *State v. Rammel*, 721 P.2d 498, 501 (Utah 1986)).

■ The State on appeal concedes and we conclude that, like the witness's testimony in *Stefaniak*, Detective DeHart's testimony that he did not believe Carleen had been coached violated Rule 608(a).[2] Although the defense had put Carleen's credibility at issue by asserting its theory that Carleen had been coached, and thus under Rule 608 the State's witnesses could bolster Carleen's character for truthfulness, DeHart improperly testified "as to the truthfulness of a witness *on a particular occasion.*" *Rimmasch*, 775 P.2d at 392 (emphasis added). Having found error, we further determine that the error should have been obvious to the trial court. Under both *Stefaniak* and *Rimmasch*, DeHart's testimony was improper because DeHart essentially averred that Carleen was truthful when she told him Adams had molested her. Thus we must determine whether, absent DeHart's testimony, there is a reasonable likelihood of a more favorable outcome for Adams.

■ The State argues DeHart's testimony was not prejudicial because the jury received from other witnesses sufficient information to show Carleen did not have the mental capacity to retain and consistently recite information urged upon her by another, and thus the detective's testimony was merely cumulative. Dr. Hawks testified extensively about Carleen's mental capacity, including her IQ of 48, which was well below normal. Dr. Hawks testified that Carleen's functioning level was about that of a three-and-a-half-year-old. He also stated she could correctly identify parts of the body from a drawing only about fifty percent of the time. She had been unable to learn to count past about thirty and could not recite the alphabet. Dr. Hawks further opined Carleen

probably did not have the mental capacity to be successfully coached into repeating a story: "It would be difficult for me to assume somebody could coach her, even if they tried, to consistently report anything."

The State further points out that Carleen's mother testified that she heard a loud noise one night and woke to find Adams emerging from Carleen's bedroom naked and carrying his pants in his hand. Adams did not deny that he came out of Carleen's room naked. Further, Adams admitted under cross-examination that he did at times become so intoxicated he could not remember what he had done.

We agree with the State that this case is different from *Stefaniak* as there is other persuasive evidence to support Adams's conviction beyond that "tainted" by the "improper testimony." We therefore find no reversible error.

### III. Prosecutorial Misconduct

■ Adams asserts the prosecution committed misconduct by implying during voir dire that the defense's expert witness, Duane Moyes, was biased against the Weber County Attorney's Office because he had been fired from the County's crime lab.[3] Adams argues it was improper for the prosecutor to refer to these extrinsic matters without producing evidence to substantiate the line of questioning. We do not address whether the prosecutor's comments constituted error because we find no evidence of prejudice.

Adams did not preserve this issue for appeal and thus we could reverse only if we found that, absent the alleged error, there is a reasonable· likelihood of a better outcome for the defendant. *See Dunn*, 850 P.2d at 1208–09. In this case, Moyes, a documents expert, testified that Virla penned letters received by women with whom Adams was

---

**2.** The Utah Rules of Evidence regarding opinion and reputation evidence of character provide:

The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthful-

ness has been attacked by opinion or reputation evidence or otherwise.
Utah R.Evid. 608(a).

**3.** Adams also argues the prosecutor engaged in misconduct when he questioned Adams about the veracity of other witness's statements. The remarks to which Adams refers were insignificant to the outcome of the trial, and we therefore do not further address the merits of this argument.

involved. Virla denied having written the letters. This evidence was intended to show Virla was vindictive and bitter towards Adams—a fact that was not contested—and that she was dishonest. Ultimately, Adams intended this testimony to convince the jury that Virla had forced Carleen to fabricate the story of molestation and repeat it to the police and jury. However, even if the jury accepted this account, they still would have to believe: 1) that Adams told the truth when he claimed not to have had sexual contact with Carleen; 2) that Carleen was mentally capable of retaining and repeating a fabricated story; and 3) that Carleen did in fact testify falsely. Thus, establishing the one element—that Virla was vindictive and dishonest—would not alone exonerate Adams. We cannot conclude that, absent the alleged prosecutorial misconduct, the jury would have returned a more favorable verdict for Adams.

## IV. Motion for Directed Verdict

 Adams argues the trial court should have dismissed the case against him at the conclusion of the State's case-in-chief because Carleen's testimony was legally insufficient to establish the elements of forcible sexual abuse. "When a motion for a directed verdict is made at the close of the State's case, the trial court should dismiss the charge if the State did not establish a prima facie case against the defendant by producing 'believable evidence of all the elements of the crime charged.'" *State v. Emmett*, 839 P.2d 781, 784 (Utah 1992) (quoting *State v. Smith*, 675 P.2d 521, 524 (Utah 1983)). If, however, "'the jury acting fairly and reasonably could find the defendant guilty beyond a reasonable doubt, the judge is required to submit the case to the jury for determination of the guilt or innocence of the defendant.'" *State v. Taylor*, 884 P.2d 1293, 1296 (Utah Ct.App. 1994) (quoting *State v. Iverson*, 10 Utah 2d 171, 350 P.2d 152, 153 (1960)). We will uphold the trial court's decision to submit a case to the jury "'if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, the court concludes that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reason-

able doubt.'" *Id.* (quoting *State v. Dibello*, 780 P.2d 1221, 1225 (Utah 1989)).

The State's theory of the crime was that Adams, with intent to arouse or gratify his own or Carleen's sexual desires, and without Carleen's consent, touched Carleen's genitals, anus, and/or buttocks with a vibrator and touched her breasts. The jury could have found proof of all these elements from the evidence presented during the State's case-in-chief.

First, the State presented evidence of identity—Carleen repeatedly testified Adams was the perpetrator. Virla corroborated Carleen's testimony when she stated that she saw Adams leave Carleen's room one night, naked, with his pants in his hand. Carleen also testified that Adams touched her genitals, her anus, or her buttocks as well as her breasts.

The State also produced evidence that Adams touched Carleen with intent to gratify or arouse himself or Carleen. The jury could have inferred the requisite intent from Carleen's testimony that Adams purposefully touched her genitals, buttocks, and/or anus with a vibrator and/or that he touched her breasts with his hands; furthermore, the required intent can be inferred from the fact that no innocent explanation for this conduct exists. *Cf. State v. Kennedy*, 616 P.2d 594, 598 (Utah 1980) (holding inference of sexual gratification was inescapable where defendant forced victim to have sex with others, recorded the acts, and played the video tapes to himself).

The State also presented evidence of the final element, lack of consent, both through Carleen's testimony that she did not like Adams to touch her and through Dr. Hawks's testimony that Carleen lacked the mental capacity to consent. Because we determine the State established a prima facie case against Adams by presenting evidence of each element of forced sexual abuse, we conclude the trial court properly denied Adams's motion for a directed verdict.

## CONCLUSION

We conclude counsel was not ineffective for failing to object to Carleen's testimony on

the ground she was incompetent because, under Utah law, diminished mental capacity alone does render a witness incompetent. We also conclude that although the admission of Detective DeHart's testimony was error, it was harmless error because other evidence at trial was sufficient to support the jury's verdict.

Furthermore, Dr. Hawks's testimony regarding Carleen's ability to be coached did not violate *Rimmasch* because he based his opinion on inherently reliable information and because he did not opine as to Carleen's truthfulness on a particular occasion. Finally, we hold the alleged prosecutorial misconduct was not prejudicial and that the trial court properly denied Adams's motion for a directed verdict. We therefore affirm Adams's conviction.

BILLINGS and JACKSON, JJ., concur.

DAVIS, Presiding Judge, dissenting:

I dissent from the majority's disposition of the case. Based on the holding of *Rimmasch*, it is my view that the relevant testimony of both Dr. Hawks and Detective DeHart were admitted in violation of Rule 608(a) of the Utah Rules of Evidence. Therefore, I would reverse defendant's conviction and remand for a new trial.

"[R]ule 608(a)(1) bars admission of an expert's testimony as to the truthfulness of a witness on a particular occasion." *State v. Rimmasch*, 775 P.2d 388, 392 (Utah 1989). In *Rimmasch*, the Utah Supreme Court determined whether the testimony of the prosecutor's expert witness directly commented on the victim's truthfulness. In response to the prosecutor's request that the expert "explain the basis for her opinion that the daughter had been sexually abused," the expert stated, " 'Well, specifically, in my opinion, one does not give this kind of information with the amount of details and the amount of clarity unless one has experienced it.' " *Id.* at 392–93 (citation omitted). When asked by the prosecutor whether the daughter had anything to gain by falsely accusing her father of sexual abuse, the expert replied that she did not think the daughter had anything to gain. *See id.* at 393.

In determining whether the testimony amounted to an opinion of the daughter's truthfulness regarding the abuse, the supreme court stated,

> Although it is arguable that this testimony amounts only to a statement of the basis of the expert's opinion on abuse, we conclude that the prosecutor, in eliciting this testimony and focusing on the reasons why Dr. Tyler thought the daughter was telling the truth, crossed the line and elicited a direct opinion on the daughter's truthfulness at the time she made her allegations of abuse. Through the first statement, the fact finder learned that Dr. Tyler, as an expert, had concluded that the daughter was telling the truth because of the amount of detail and clarity the daughter used in relating the alleged occurrences of sexual abuse. The second statement told the fact finder that one of the reasons Dr. Tyler thought the daughter's accusations of abuse against her father were truthful was because the doctor could envision no motive for the daughter to lie.

*Id.* The court then held that the trial court erred in admitting the testimony into evidence in violation of Rule 608(a). *See id.*

Dr. Hawks's testimony here is comparable to the expert's testimony in *Rimmasch*. The relevant colloquy at trial was as follows:

> [Prosecutor:] Dr. Hawks, let me ask you this. Based on your experience with prior or similar interviews with sex abuse victims, with children or otherwise, did you find—*did you form an opinion as to Carleen's—as to whether her story was improbable or not believable*?
>
> . . . .
>
> [Defense counsel]: I don't believe, Your Honor, that's a proper question for him to be answering.
>
> The Court: An expert witness can't opine concerning reliability of witnesses. The objection is sustained. That's the function of the jury.
>
> [Prosecutor:] Could your evaluation and expertise tell you whether she was *sophisticated enough to make up the story that was alleged here*?
>
> . . . .

[Defense counsel]: And at this point, Your Honor, I'm going to object to him answering that until there's further foundation. What he's talking about now I don't believe—he's gone into his examination of her testifying truthfully in this case. That, again, is the prerogative of the jury. I think it's improper.

The Court: Well, I think the form of the question is different and he has given some background. The objection is overruled.

[Dr. Hawks:] In my opinion, that's a difficult question and surely I couldn't answer that 100 percent positively; however; it would seem that someone who—in the school system who has been taught in special ed and resource classes—and she's 34, I believe—and if all those years of special ed and resource classes couldn't get her to even write her name correctly, couldn't get her to pass—count past age 50[1]—I mean, count past number 50 or say the alphabet, that I'd have trouble—*it would be difficult for me to assume somebody could coach her,* even if they tried, to consistently report anything, you know, even their birthday. I mean, she was inaccurate in giving her birthday. She struggled with that.

So I find it trouble if—if she has difficulty in doing, you know, second and third grade level, that I would—I'd have real trouble to see anybody: a mother or me or the school system, if they can't do it with counting, how could—I ask myself, could someone do it with persuasion or threats to—to get her to consistently across two interviews spontaneously talk about some sexual activities that occurred.

*So in my opinion, that's probably not likely.*

(Emphasis added.) Thus, Dr. Hawks opined that it was "probably not likely" that Carleen was either coached or sophisticated enough to make up the story alleged here.

1. If Dr. Hawks's remarks were restricted to Carleen's limited abilities, it is doubtful that his testimony would have violated Rule 608(a), and the jury would have had the opportunity to decide whether she was being truthful.

2. Rule 608(a) is especially important here where the focus of the defense is on the credibility of the only direct witness. Defendant claimed that Carleen's mother, who was defendant's "jilted"

It stretches the imagination to see how this testimony does anything other than improperly comment on Carleen's truthfulness on a particular occasion.[2] *See Rimmasch,* 775 P.2d at 392. The prosecutor clearly intended to have Dr. Hawks testify regarding Carleen's truthfulness as to the alleged events and, after a proper and timely objection by defense counsel, simply rephrased the question and got the desired answer as to Carleen's truthfulness. As in *Rimmasch,* although Dr. Hawks's testimony arguably amounts to no more than a statement of his opinion as to whether Carleen has the cognitive ability to be coached, the jury heard that Dr. Hawks, as an expert, believed that Carleen was telling the truth because she did not have the ability to be coached and was not sophisticated enough to make up the story. Therefore, by allowing Dr. Hawks to testify as he did, the trial court did exactly what Rule 608(a) and *Rimmasch* prohibits—admitted expert testimony as to a witness's truthfulness on a particular occasion.

Detective DeHart also testified regarding whether he thought Carleen was coached:

[Prosecutor:] Okay. Did it appear to you at all that Carleen was coached?

[Detective DeHart:] No, it did not appear to me that Carleen had been coached.

[Prosecutor:] Either at the time or even—even prior to your coming there?

[Detective DeHart:] No, it did not.

The majority opinion correctly concludes that Detective DeHart's testimony was in violation of Rule 608(a) and supports its conclusion that the error was harmless by holding that the detective's testimony was merely *cumulative* of the "proper" testimony of Dr. Hawks. I find it illogical that Detective DeHart's testimony, determined by the majority to be in violation of Rule 608(a), can be termed "cumulative" of Dr. Hawks's testimo-

lover, invented the allegations and then coached Carleen to tell the story in retaliation for defendant breaking off their relationship. Because the only real evidence supporting Carleen's allegations was Carleen's testimony, thus making the case a credibility contest, an improper bolstering of her credibility put defendant at an unfair disadvantage.

ny, determined by the majority to be within the parameters of Rule 608(a). From the perspective of a juror, it is hard to imagine how the detective improperly testified as to the witness's truthfulness on a particular occasion or "essentially averred that Carleen was telling the truth" and the expert did not.

The error in this case was prejudicial to defendant. *See State v. Stefaniak*, 900 P.2d 1094, 1096 (Utah Ct.App.1995) ("Having determined that the court erred in admitting the testimony bolstering the victim's credibility, we must separately determine whether the error was prejudicial in this case."). " '[T]his case depended on the jury's assessment of the victim's credibility versus the defendant's, and there is not "other evidence [to support] the defendant's conviction" . . . beyond that which is tainted by . . . improper testimony.' " *Id.* (quoting *State v. Iorg*, 801 P.2d 938, 941 (Utah Ct.App.1990) (citation omitted)) (alterations in original). In the context of this case, the "other evidence" supporting Carleen's allegations (itself bolstered by Carleen's testimony which was bolstered by the expert and the detective) is, even if true, hardly adequate to support a conviction. Accordingly, I would reverse defendant's conviction and remand for a retrial.