2000 UT 42

**STATE of Utah, Plaintiff and Respondent,**

v.

**Nealy W. ADAMS, Defendant and Petitioner.**

**No. 980261.**

Supreme Court of Utah.

May 5, 2000.

---

2.   Because we decided not to rehear the case, but only to modify part of the court's earlier opinion, no further action is required.

Jan Graham, Att'y Gen., Joanne C. Slotnik, Asst. Att'y Gen., Salt Lake City, and Les Daroczi, Ogden, for plaintiff.

Gregory G. Skordas, Lloyd R. Jones, Brett J. DelPorto, Salt Lake City, for defendant.

WILKINS, Justice:

¶ 1 Nealy W. Adams was convicted of one count of forcible sexual abuse pursuant to Utah Code Ann. § 76–5–404(1) (1999). The court of appeals affirmed, *State v. Adams,* 955 P.2d 781 (Utah Ct.App.1998), and we issued a writ of certiorari to review that court's decision, *cert. granted,* 982 P.2d 87 (Utah 1998). We affirm.

### BACKGROUND

¶ 2 In 1993, Adams developed a relationship with Virla Hess and moved into her

home, where she lived with her thirty-four-year-old daughter Carleen, who suffers from Down's Syndrome. Carleen is unable to read or write and has the cognitive abilities of a three-and-one-half-year-old.

¶ 3 In late 1994, Adams, who was a regular drinker, began drinking excessively and occasionally became so intoxicated that he was unable to remember what he had done while inebriated. During this time, Virla noticed that Carleen became more reclusive, spending most of her free time in her room with the door closed.

¶ 4 Adams' relationship with Virla began to deteriorate in 1995. One night, Virla awoke to the sound of a bang followed by breaking glass. She got up to investigate and saw Adams, naked, with his pants in his hand, emerging from Carleen's bedroom. When Virla spoke with Adams about the incident the following morning he said he had been drinking and could not remember anything that had happened that night. Thereafter, the parties agreed that Adams should move out of Virla's house.

¶ 5 When Virla told Carleen that Adams was leaving, Carleen responded by telling her mother, "Good, he's been messing with me." Virla waited until Adams had removed all of his belongings before contacting the police and reporting the alleged abuse. Detective DeHart conducted an interview with Carleen in her mother's presence. Adams was later charged with one count each of rape and forcible sexual abuse.

¶ 6 At trial, Carleen testified that she had been molested by Adams. On cross-examination, Adams suggested that Virla invented the allegations and then coached Carleen to tell the story in retaliation for Adams breaking off the relationship. In response, the State elicited testimony from Detective DeHart, who stated that he was unable to lead Carleen with his questions and that, in his opinion, she did not appear to be coached. He testified that Carleen's initial account of the molestation had remained consistent with her subsequent description of those events. The State also called Dr. Hawks, a psychologist who had evaluated Carleen's general cognitive abilities and who testified that it was unlikely Carleen could be coached to tell,

or was sophisticated enough to make up, the story alleged here. Based on the evidence adduced, a jury acquitted Adams of rape, but found him guilty of forcible sexual abuse.

¶ 7 Adams appealed to the Utah Court of Appeals, alleging, among other things, that the testimony of Dr. Hawks and Detective DeHart improperly bolstered Carleen's credibility. Adams also argued that the State had failed to establish a proper foundation for Dr. Hawks' testimony that Carleen was incapable of being coached. The court of appeals rejected Adams' argument that Dr. Hawks' testimony improperly bolstered Carleen's credibility; however, the court concluded that Detective DeHart's testimony violated Rule 608(a) of the Utah Rules of Evidence, which governs opinion testimony on character or truthfulness. *See Adams*, 955 P.2d at 786. Nevertheless, with respect to Detective DeHart's testimony the court of appeals affirmed. The court said that Adams' conviction was supported by other persuasive evidence, and therefore, the admission of Detective DeHart's testimony was harmless error. *See id.* The court of appeals also held that Dr. Hawks' testimony satisfied the foundational requirements for admitting scientific testimony established in *State v. Rimmasch*, 775 P.2d 388 (Utah 1989). *See Adams*, 955 P.2d at 784–85. Adams sought review of the court of appeals' decision by petitioning this court for a writ of certiorari, which we granted.

## ISSUES AND STANDARDS OF REVIEW

¶ 8 Before this court, Adams argues the court of appeals erred in (1) concluding Rule 608(a) of the Utah Rules of Evidence was not violated by the admission of Dr. Hawks' testimony that Carleen did not possess the intellectual capacity to either be coached or invent a false story, and (2) concluding that Dr. Hawks' testimony concerning Carleen's credibility was admissible under Rule 702 of the Utah Rules of Evidence. Adams also maintains (3) that the court of appeals erred in determining that Detective DeHart's improper bolstering of Carleen's credibility was harmless error because it did not prejudice the outcome of the trial.

¶ 9 On a writ of certiorari, we review the decision of the court of appeals, not that of the trial court. *See Platts v. Parents Helping Parents,* 947 P.2d 658, 661 (Utah 1997). This case involves the admissibility of expert testimony, and therefore, the court of appeals properly reviewed the decision of the trial court under an abuse of discretion standard. *See State v. Larsen,* 865 P.2d 1355, 1361 (Utah 1993). In addition, because Adams failed to raise a timely and specific objection to Detective DeHart's testimony in the trial court, the court of appeals reviewed that issue for plain error. *See State v. Dunn,* 850 P.2d 1201, 1208 (Utah 1993).

## ANALYSIS

### I. ADMISSIBILITY OF DR. HAWKS' TESTIMONY

#### A. *Opinion on Mental Capacity*

¶ 10 We turn first to Adams' claim that Dr. Hawks' testimony violated Rule 608(a) of the Utah Rules of Evidence. Specifically, Adams argues that Dr. Hawks improperly bolstered Carleen's credibility by testifying that she either did not or could not lie about the allegations against Adams. We disagree.

¶ 11 Rule 608(a)(1) "permits testimony concerning a witness's general character or reputation for truthfulness ... but prohibits any testimony as to a witness's truthfulness on a particular occasion." *See Rimmasch,* 775 P.2d at 391. In order to determine whether Dr. Hawks' testimony violated rule 608(a), we review his testimony concerning whether Carleen could have been coached. The relevant trial colloquy is as follows:

Q: Could your evaluation and expertise tell you whether [Carleen] was sophisticated enough to make up the story that was alleged here?

A: And, of course, as I mentioned, that's one of the things we deal with all the time, did somebody coach you—

[DEFENSE COUNSEL]: And at this point, Your Honor, I'm going to object to his answering that until there's further foundation. What he's talking about now I don't believe—he's gone into his examination of her testifying truthfully in this case. That, again, is the prerogative of the jury. I think it's improper.

THE COURT: Well, I think the form of the question is different and he has given some background. The objection is overruled.

A: In my opinion, that's a difficult question and surely I couldn't answer that 100 percent positively; however[,] it would seem that someone who—in the school system who has been taught in special ed and resource classes[,] and she's 34, I believe[,] and if all those years of special ed and resource classes couldn't get her to even write her name correctly, couldn't get her to ... count past number 50 or say the alphabet, that I'd have trouble—it would be difficult for me to assume somebody could coach her, even if they tried, to consistently report anything, you know, even their birthday. I mean, she was inaccurate in giving her birthday. She struggled with that.

So I find it troubling if—if she has difficulty in doing, you know, second and third grade level, that I would—I'd have real trouble to see anybody[—]a mother or me or the school system[—]if they can't do it with counting, how could—I ask myself, could someone do it with persuasion or threats to[,] to get her to consistently across two interviews spontaneously talk about some sexual activities that occurred. So in my opinion, that's probably not likely.

¶ 12 After reviewing this testimony, the court of appeals concluded Dr. Hawks' testimony did not violate rule 608(a) because it "did not go to whether Carleen was telling the truth.... [Rather] Dr. Hawks merely stated it was his opinion she did not have the cognitive ability to be coached." *Adams,* 955 P.2d at 783 n. 1. Adams, however, asserts that this testimony amounted to an expert opinion about Carleen's truthfulness on a particular occasion because no meaningful legal distinction can be drawn between whether Carleen has the mental capacity to invent or learn and consistently repeat a false story, and whether Carleen lied on this particular occasion. Adams contends that in

either case, the evidence is "an opinion as to whether the jury can trust [Carleen's] testimony—precisely what rule 608(a) forbids."

¶ 13 Although Dr. Hawks testified that it was "probably not likely" that Carleen was either coached or "sophisticated enough to make up the story that was alleged here," he did not offer a direct opinion of Carleen's truthfulness about the alleged sexual abuse. Dr. Hawks merely stated that Carleen's mental capacity probably prevented her from either inventing or learning and consistently repeating a fabricated story. However, he did not offer a subjective credibility determination that Carleen was telling the truth about the alleged sexual abuse, nor did he completely rule out the possibility that Carleen could have lied about this incident. Instead, Hawks stated that based on his evaluation of Carleen's general cognitive abilities, he found it unlikely that she could learn and consistently repeat a false story or fabricate her own. Although this is a subtle distinction, and one may infer from Dr. Hawks' testimony that he finds Carleen's story credible, there is a fundamental difference between testifying that Carleen does not possess the mental capacity to invent or learn a fabricated story and opining that Carleen was telling the truth about the alleged sexual abuse. Dr. Hawks' testimony regarding Carleen's limited mental capacity to fabricate or learn a story is not the equivalent of an affirmative statement that Carleen was in fact telling the truth about the alleged abuse. Rather, Dr. Hawks' testimony went to whether Carleen's mental facilities would prevent her from learning or fabricating a story, not whether she was being truthful in this particular instance.

¶ 14 Rule 608(a) does not prohibit an expert such as Dr. Hawks from giving testimony from which a jury could infer the veracity of the witness. Rather, it only bars direct testimony regarding "the truthfulness of a witness on a particular occasion." *Rimmasch*, 775 P.2d at 392. Because Dr. Hawks' testimony did not directly address Carleen's veracity about the alleged abuse in this case, it did not impermissibly invade the province of the jury or violate rule 608(a). *See State v. Workman*, 852 P.2d 981, 984 (Utah 1993)

("When the evidence presented is . . . disputed, the jury serves as the exclusive judge of both the credibility of the witness and the weight to be given particular evidence."). Because Dr. Hawks did not improperly comment on Carleen's veracity on a particular occasion, his testimony did not violate rule 608(a) of the Utah Rules of Evidence. Accordingly, we affirm the court of appeals' ruling on this issue.

### B. Adequacy of Foundation for Dr. Hawks' Testimony

¶ 15 Before the court of appeals, Adams argued that Dr. Hawks' testimony failed to satisfy the reliability requirements established in *State v. Rimmasch*, 775 P.2d 388 (Utah 1989). However, the court of appeals rejected this argument, and relying on *Rimmasch*, concluded that Dr. Hawks' testimony met the three-part standard for admitting scientific evidence under Utah Rule of Evidence 702. *See Adams*, 955 P.2d at 784–85. More specifically, the court of appeals concluded that (1) Dr. Hawks based his opinion on inherently reliable information, (2) Dr. Hawks properly applied the scientific principles to the facts, and (3) the probative value of Dr. Hawks' testimony outweighed its potential for prejudice. *See id.* While the court of appeals reached the correct conclusion in holding that Dr. Hawks' testimony was properly admitted under rule 702, we conclude the court's reliance on *Rimmasch* was misplaced.

¶ 16 In *Rimmasch*, we held that expert testimony "based upon *novel scientific principles or techniques* . . . [was subject to] additional tests of admissibility," including that the novel technique be "inherently reliable." *Rimmasch*, 775 P.2d at 396 (emphasis added). However, the *Rimmasch* test was not intended to apply to all expert testimony. Rather, *Rimmasch* is implicated only when the expert testimony is "based on *newly discovered principles*." *Id.* (emphasis added); *see also State v. Kelley*, 2000 UT 41, ¶ 19 (concluding *Rimmasch* is inapplicable where "there is no plausible claim that the type of expert testimony offered by the prosecution was based on novel scientific principles or techniques"); *Patey v. Lainhart*, 1999

UT 31, ¶ 16, 977 P.2d 1193 (refusing to apply *Rimmasch* test where expert's testimony not based on novel scientific principles or techniques). In this case, Dr. Hawks' testimony was not based on novel scientific evidence. In fact, the tests Dr. Hawks employed in examining Carleen have been administered since the 1950s, and Adams concedes that "[t]hese tests unquestionably meet the reliability standard of *Rimmasch*." Nevertheless, Adams asserts that *Rimmasch* applies because the actual testimony of Dr. Hawks is not inherently reliable. This argument is without merit. *Rimmasch* simply requires that the scientific principles underlying the expert's testimony be inherently reliable, not that the expert's actual testimony be inherently reliable. *See, e.g., State v. Van Matre,* 777 P.2d 459, 461 (Utah 1989) (stating that in *Rimmasch* "[w]e determined ... that the inherent reliability of the scientific principles and techniques *upon which credibility appraisals and profile-based opinion testimony are predicated* must be determined before a trial court can admit that evidence" (emphasis added)); *State ex rel. G.D. v. L.D.,* 894 P.2d 1278, 1284 (Utah Ct.App.1995) ("*Rimmasch* requires the trial court to scrutinize the scientific or statistical principles upon which the expert's testimony *is based.*" (emphasis added)). Therefore, the *Rimmasch* standard for admitting novel scientific evidence does not apply to the present case.

¶ 17 However, this conclusion does not end our inquiry. Dr. Hawks' testimony must still be evaluated for admissibility under "the general rule for the admission of all expert testimony," which is articulated in rule 702. *Rimmasch,* 775 P.2d at 396. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Utah R. Evid. 702.

¶ 18 In this case, it is clear that Dr. Hawks had specialized knowledge which would assist the fact finder. At trial, Adams' defense was that Virla, Adams' "jilted" lover, invented the allegations and then coached Carleen to tell the story in retaliation for Adams breaking off their relationship. Dr. Hawks' testimony specifically addressed the issue of whether Carleen had the mental capacity to learn and consistently repeat a fabricated story of sexual abuse. Dr. Hawks is a designated mental retardation expert with extensive experience in evaluating victims of alleged sexual abuse. Clearly, the ability to assess and evaluate the intellectual capacities of a mentally handicapped individual is not within the knowledge or experience of the average individual, and therefore, this "evidence ... [was] helpful to the finder of fact." *Rimmasch,* 775 P.2d at 398 n. 8. Accordingly, the trial court did not exceed its permitted range of discretion by admitting Dr. Hawks' testimony, and therefore we affirm the court of appeals' conclusion that Dr. Hawks' testimony was properly admitted.

## II. DETECTIVE DEHART'S TESTIMONY

¶ 19 At trial, Detective DeHart testified without objection that he did not believe Carleen was coached and that her account of the alleged sexual abuse was consistent. On appeal, Adams argued, and the State conceded, that this testimony violated rule 608(a) because it essentially vouched for Carleen's " 'truthfulness ... on a particular occasion.' " *Adams,* 955 P.2d at 786 (emphasis omitted) (quoting *Rimmasch,* 775 P.2d at 392). Although the court of appeals agreed that the testimony was improper, it concluded that the admission of Detective DeHart's testimony was harmless error because "other persuasive evidence ... support[ed] Adams's conviction." *Adams,* 955 P.2d at 786. Before this court, Adams asserts that Detective DeHart's testimony was prejudicial and constitutes plain and reversible error. Specifically, he contends that absent Detective DeHart's improper testimony, there is a reasonable likelihood that a more favorable result would have been reached. We disagree.

¶ 20 Because Adams failed to raise this issue below, the court of appeals correctly applied the plain error standard. To establish plain error, Adams must show

that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). A harmful error occurs where "the likelihood of a different outcome [in the absence of the error is] sufficiently high [so as] to undermine confidence in the verdict." *State v. Knight*, 734 P.2d 913, 920 (Utah 1987). Like the parties and the court of appeals, we conclude that Detective DeHart's testimony violated rule 608(a) and that this error should have been obvious to the trial court. The only remaining question, therefore, is whether, absent Detective DeHart's improper statements, Adams would have enjoyed a sufficiently high likelihood of a different result such that our confidence in the outcome is undermined.

¶ 21 Applying that standard to the facts of this case, it is clear that Adams was not prejudiced by Detective DeHart's improper testimony. Our review of the record reveals ample evidence upon which the jury could have convicted Adams of forcible sexual abuse. Carleen testified that Adams had been molesting her. Carleen's testimony was bolstered by her mother's statement that late one night she saw Adams, naked, emerge from her daughter's bedroom with his pants in his hand. Also, Carleen corroborated this incident, stating that she awoke to the sound of a breaking clock, and that Adams "c[ame] in and g[ot] on me." Adams testified that he had been drinking that night and did not recall the alleged incident. However, Adams did not deny that he came out of Carleen's room naked, and he admitted that there were times when he became so intoxicated that he could not remember what he had done.

¶ 22 Also, with regard to Adams' theory that Carleen had been coached by her mother to repeat a false story, Dr. Hawks testified extensively about Carleen's severe intellectual disabilities. He stated that Carleen has the cognitive abilities of a three-and-one-half-year-old and "that 99 [out of 100] individuals can do better than she can on [intellectual tests]." Dr. Hawks also testified that Carleen had been in special education classes for years and still could not count, recite the alphabet, or spell her own name. Dr. Hawks opined that, based on these limited cognitive capacities, Carleen probably did not have the ability to be coached and was probably not sophisticated enough to make up the story about the abuse. Therefore, although we find Detective DeHart's references to Carleen's veracity erroneous and clearly improper, we cannot say that in their absence Adams would likely have received a more favorable result. Accordingly, we affirm the court of appeals' ruling on this issue.

## CONCLUSION

¶ 23 We conclude that Dr. Hawks' testimony did not violate rule 608(a) because he did not offer a direct opinion of Carleen's truthfulness about the alleged sexual abuse. Rather, he testified only about Carleen's ability to be coached to tell a false story, and her lack of sophistication to invent and repeat such a story on her own. Also, we affirm the court of appeals' conclusion that Dr. Hawks' testimony was properly admitted under rule 702 but for different reasons. Dr. Hawks' testimony was not based upon new or novel scientific principles or techniques. The three-part *Rimmasch* test does not apply, and Dr. Hawks' testimony was otherwise admissible under rule 702. Finally, we hold that the erroneous admission of Detective DeHart's testimony was harmless error because other persuasive evidence supports Adams' conviction, and there is not a sufficient likelihood of a more favorable outcome so as to undermine our confidence in the verdict. The decision of the court of appeals is affirmed.

¶ 24 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice DURRANT concur in Justice WILKINS' opinion.