2019 UT App 54

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ANTONIO DEWAYNE CEGERS,
Appellant.

Opinion
No. 20161018-CA
Filed April 4, 2019

Third District Court, Salt Lake Department
The Honorable James T. Blanch
No. 161900207

Nathalie S. Skibine, Lisa J. Remal, and Tawni
Hanseen Bugden, Attorneys for Appellant

Sean D. Reyes and Jeffrey D. Mann, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

HAGEN, Judge:

¶1     Antonio Dewayne Cegers was convicted of sexually abusing his girlfriend's daughter (M.F.) and one of M.F.'s friends (S.B.). He now appeals his convictions for one count of aggravated sexual abuse of a child, one count of sexual abuse of a child, and one count of forcible sexual abuse.

¶2     Cegers raises four issues that we reach on appeal. First, Cegers argues that the district court erred when it allowed the State to admit testimony from M.F.'s high school counselor that bolstered M.F.'s credibility. At trial,

M.F.'s counselor testified that she did not believe that M.F. fabricated the allegations against Cegers to receive a school scholarship. Because this testimony offered an opinion as to M.F.'s truthfulness on a particular occasion, it constituted impermissible bolstering. Although Cegers did not raise a bolstering objection, we address the issue on appeal because Cegers has successfully argued that the plain error exception to the preservation rule applies. We conclude that the admission of the counselor's testimony, combined with the district court's subsequent instruction directing the jury to consider the counselor's opinion, amounted to plain error. And because the State introduced no evidence of Cegers's guilt apart from the alleged victims' testimony, Cegers was prejudiced by the impermissible bolstering. Accordingly, we must vacate Cegers's convictions and remand to the district court for a new trial.

¶3 Although we vacate his convictions based on impermissible bolstering, we address three other issues Cegers raises on appeal that may be relevant on remand. With respect to his challenge to the sufficiency of the evidence, we conclude that the victims' testimony was not so inherently improbable that it could not sustain his convictions and affirm the district court's denial of his motion for a directed verdict. We also conclude that the jury instructions did not misstate the law or mislead the jury with respect to the intent elements of sexual abuse of a child and forcible sexual abuse. Finally, the district did not err in declining to review M.F.'s medical records in camera because Cegers did not make a threshold showing that the records related to the kind of condition contemplated by rule 506(d)(1) of the Utah Rules of Evidence. Accordingly, we affirm the district court's rulings on these issues.

BACKGROUND[1]

¶4 In June 2011, S.B. disclosed to her brother, mother, and a friend that Cegers had molested her while she was sleeping over with M.F. S.B.'s mother reported Cegers to the police. Shortly thereafter, the police met and spoke with M.F., the daughter of Cegers's girlfriend. M.F. told the police that she was not aware that anything had happened to S.B. while she was at M.F.'s home and that she herself had never been sexually abused by Cegers.

¶5 Roughly four years later, Cegers and M.F.'s mother separated. After M.F. and her mother moved out of Cegers's home following a domestic violence disturbance, M.F. told her mother that Cegers had been sexually abusing her since she was five years old. The next day, M.F. also confided in her school counselor that Cegers had sexually abused her throughout her childhood. After M.F. disclosed the abuse to her counselor, the counselor contacted the police.

¶6 Upon receiving M.F.'s report of abuse, the State charged Cegers with six counts of aggravated sexual abuse of a child, *see*

---

1. Ordinarily, we recite facts in a light most favorable to the jury's verdict, and present evidence that conflicts with the verdict "only as necessary to understand the issues raised on appeal." *State v. Bond*, 2015 UT 88, ¶ 3 n.2, 361 P.3d 104 (quotation simplified). Cegers was acquitted of five of the eight charges against him. But because of the manner in which the State charged the offenses, it is unclear what portion of the evidence supports his convictions. As a result, we recite all of the evidence as it was presented at trial with the acknowledgement that the verdict suggests the jury did not find all of these facts to be proven beyond a reasonable doubt.

Utah Code Ann. § 76-5-404.1(4) (LexisNexis Supp. 2018),[2] relating to both S.B. and M.F., and two counts of forcible sexual abuse, *see id.* § 76-5-404, relating to M.F.

¶7    Before trial, Cegers filed a motion to sever the charges relating to M.F. and S.B. and a motion to allow Cegers to subpoena M.F.'s medical and school records. The district court denied the motion to sever, concluding that the charges relating to S.B. were properly joined with the charges relating to M.F. and that the joinder did not prejudice Cegers. The district court also denied Cegers's motion to subpoena M.F.'s medical, counseling, and school records under rule 506(d)(1) of the Utah Rules of Evidence. Regarding the medical records, which included counseling records dating back to 1997 and counseling records from some of the hospitals[3] that provided care for M.F. after a suicide attempt in 2013, the court concluded that Cegers had not shown that M.F. suffered from a relevant emotional condition as required by rule 506(d)(1) and that he had not shown with reasonable certainty that the records contained exculpatory evidence. Regarding M.F.'s school records, the district court denied Cegers's request because the defense had failed to "lay out what the standards of the expectations of privacy are with respect to those records."

---

2. Because the statutory provisions in effect at the relevant time do not differ in any material way from the provision now in effect, we cite the current version of the Utah Code.

3. As part of discovery, the State had already provided Cegers with records from one hospital that provided care to M.F. after her attempted suicide. Consequently, Cegers was requesting records only from the care providers that had not already been disclosed.

¶8    Additionally, prior to presentation of the State's evidence at trial, Cegers objected to the "intent requirements" in the element jury instructions for sexual abuse of a child and forcible sexual abuse. Specifically, Cegers objected to the instructions' inclusion of "knowingly" and "recklessly" as possible mental states with which Cegers could have committed the touching elements of both offenses, arguing that sexual abuse of a child and forcible sexual abuse are "specific intent crime[s]." The district court overruled Cegers's objection, emphasizing that the Model Utah Jury Instruction after which the instructions were patterned accurately stated that "it is the more general mens rea that applies with respect to the touching."

¶9    At trial, the State introduced testimony from S.B., M.F., M.F.'s counselor, S.B.'s mother, S.B.'s brother, a friend of S.B., and M.F.'s mother. S.B. testified that M.F. was her "best friend" until part way through junior high school and that she spent a considerable amount of time at the home that Cegers shared with M.F.'s mother, M.F., and Cegers's other children. She testified that she remained friends with M.F. until Cegers made her feel too uncomfortable to return to their home.

¶10    S.B. described several incidents where Cegers touched her sexually. According to her testimony, Cegers would wait until she was alone with him and touch her breasts and groin area over and under her clothing. She said these incidents took place in Cegers's home in the living room while she was sleeping or lying on the couch or floor and in the kitchen washing dishes.

¶11    M.F. testified that she was not aware that Cegers had abused S.B. Although she remembered the police speaking with her about S.B.'s allegations, according to M.F., neither the police nor Cegers ever provided her with specific details. But M.F. testified extensively about her own sexual abuse by

Cegers, stating that Cegers began touching her sexually when she was five years old and that the abuse continued into her teenage years. According to M.F., Cegers repeatedly rubbed her vagina over her clothes with his feet and hands, brushed his hands underneath her breasts, and pressed his erect penis against her. M.F. also described incidents where, while she was sitting on the couch in Cegers's living room, Cegers rubbed her vagina over her clothes.

¶12    M.F. did not disclose Cegers's conduct to anyone until she was eighteen years old. According to M.F., Cegers's relationship with her mother and the other children in the home was tense. M.F. felt that Cegers treated her as his "favorite" when she was younger, but he would swear at, hit, and ground his biological children. In addition, M.F.'s mother was financially unstable. M.F. testified that, as a result, she felt her family would suffer if she reported Cegers's abuse. M.F. only disclosed Cegers's abuse to her mother during her senior year of high school. After an altercation involving M.F., her mother, and Cegers that resulted in M.F. and her mother moving out of their shared home, M.F. admitted to her mother that Cegers had been abusing her since she was a young child.

¶13    M.F.'s high school counselor testified that M.F. also disclosed the sexual abuse to her the day after M.F. reported the abuse to her mother. The counselor testified that she had met with M.F. periodically following M.F.'s attempted suicide years prior and continuing through M.F.'s senior year. During this time, they spoke about M.F.'s discomfort at home, her anxiety, and her academic plans. According to the counselor's testimony, because she had been meeting with M.F. for some time, M.F.'s disclosure came as a surprise to her. The counselor immediately reported the allegations to the police. The police came to the school and interviewed M.F. in the counselor's office.

¶14    Around this same time, M.F. applied for a scholarship offered to students who had overcome substantial challenges. In the scholarship application, M.F. included information about Cegers's abuse. When the State asked whether M.F.'s counselor believed that M.F. fabricated her allegations against Cegers to qualify for a scholarship, her counselor responded that the suggestion was "the most absurd thing [she had] ever heard of. There is—there is no way [she] would ever conceive that that would be possible." Cegers objected to this testimony, arguing that the counselor was "speculating about what's in somebody else's mind." The district court overruled Cegers's objection. The counselor explained that she had not spoken with M.F. about the scholarship any more than she had with other students, and she was not sure when, in relation to M.F.'s reports of abuse, M.F. had applied for the scholarship.[4] After the State concluded the counselor's direct examination and without prompting from defense counsel or the prosecutor, the district court gave the following instruction to the jury:

> [W]ith respect to the question about the witness'[s] view about whether [M.F.] would have been fabricating in order to get a scholarship. I overruled the objection that was made, which was that a witness can't testify about what's in another person's mind, and that is correct. The witness can't testify about what's in someone else's mind.
>
> So you are to consider her testimony in that regard only to the extent that she was expressing her opinion based on the period of time that she knew the witness and the overall facts and

---

4. M.F. testified that she had applied for the scholarship the day after she reported the abuse to the counselor.

circumstances, but not because she has the ability
to know what another person is thinking.

¶15    After S.B., M.F., and the school counselor testified, the
State presented testimony from S.B.'s mother, S.B.'s brother, and
a friend of S.B., and M.F.'s mother. None of the subsequent
witnesses testified that they had witnessed or suspected any
sexually abusive behavior by Cegers against the victims. At the
conclusion of the State's case in chief, Cegers made a motion for
a directed verdict, which the district court denied. Cegers then
testified in his own defense and denied ever touching the victims
in a sexually inappropriate manner.

¶16    The jury convicted Cegers of one count of aggravated
sexual abuse of a child relating to M.F., one count of sexual
abuse of a child relating to S.B., and one count of forcible sexual
abuse relating to M.F. Cegers appeals.

ISSUES AND STANDARDS OF REVIEW

¶17    Cegers contends that the district court erred by allowing
the State to admit testimony from the school counselor that
impermissibly bolstered M.F.'s credibility. If preserved, we
review the district court's admission of testimony for an abuse of
discretion. *State v. Iorg*, 801 P.2d 938, 939 (Utah Ct. App. 1990).
But if a party fails "to raise a timely and specific objection" to the
district court's evidentiary ruling, the defendant must show that
an exception to the preservation rule applies. *State v. Johnson*,
2017 UT 76, ¶¶ 18–19, 416 P.3d 443. Cegers argues that, if the
issue on appeal was not preserved below, the plain error
exception applies. "Under the plain error doctrine, we will
reverse the trial court's ruling only if (i) an error exists; (ii) the
error should have been obvious to the trial court; and (iii) the
error is harmful, i.e., absent the error, there is a reasonable

likelihood of a more favorable outcome for the defendant." *State v. Diaz-Arevalo*, 2008 UT App 219, ¶ 8, 189 P.3d 85.

¶18 Because we conclude that Cegers is entitled to a new trial based on this evidentiary error, we must next decide whether Cegers is subject to retrial. We review the district court's denial of Cegers's motion for a directed verdict because, if the evidence at trial was insufficient to sustain his convictions, double jeopardy may bar retrial. *See Burks v. United States*, 437 U.S. 1, 17 (1978) (stating that "the purposes of the [Double Jeopardy] Clause would be negated" were the government to be afforded "an opportunity for the proverbial 'second bite at the apple'" after presenting insufficient evidence in the first instance); *see also State v. Lamorie*, 610 P.2d 342, 347 (Utah 1980) ("Reversal and remand for a new trial does not place the accused in double jeopardy where the error giving rise to the reversal is merely trial error, as distinguished from insufficiency of the evidence."). "We review a trial court's ruling on a motion for directed verdict for correctness." *State v. Gonzalez*, 2015 UT 10, ¶ 21, 345 P.3d 1168. "We will uphold the trial court's decision if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183 (quotation simplified).

¶19 We also reach two additional issues that are likely to resurface on remand. *See State v. Ogden*, 2018 UT 8, ¶ 49, 416 P.3d 1132 (noting that "we retain the authority to reach issues when we believe our analysis could prove helpful on remand").[5]

---

5. Cegers raises two other issues on appeal that we do not address. Although we recognize that "it is our duty to pass upon questions of law which may be pertinent and helpful in arriving

(continued…)

Cegers contends that the district court erred by "improperly" instructing the jury as to the intent element of the aggravated sexual abuse of a child, sexual abuse of a child, and forcible sexual abuse charges. A claim that the district court provided an

---

(…continued)

at a final determination of the case," *State v. Cloud*, 722 P.2d 750, 755 (Utah 1986) (quotation simplified), the issues we decline to address do not "fit within that category," *State v. Moore*, 2009 UT App 386, ¶ 11 n.5, 223 P.3d 1137. First, Cegers challenges the district court's denial of his motion to sever the charges relating to M.F. from the charges relating to S.B. In denying Cegers's motion to sever, the district court considered the evidence supporting the charges and allegations and determined (1) whether the offenses charged are "based on the same conduct or are otherwise connected together in their commission" or are "alleged to have been part of a common scheme or plan" and (2) whether the "defendant . . . is prejudiced by a joinder of offenses." Utah Code Ann. § 77-8a-1(1), (4)(a) (LexisNexis 2017). Ordinarily, we would review both determinations for a clear abuse of discretion. *See State v. Hattrich*, 2013 UT App 177, ¶ 8, 317 P.3d 433. But here, the jury acquitted Cegers of all but three of the charges, only one of which related to S.B. And of the offenses for which he was convicted, it is not readily apparent what alleged conduct supported his conviction of which offense. As a result, it is unlikely that the district court's assessment of evidence supporting joinder of the charges relating to S.B. and M.F. would be the same on remand. We therefore see no value in reviewing the court's prior determination.

Second, Cegers claims that the district court's errors prejudiced him when viewed cumulatively. It is unnecessary to consider this argument because we find that the evidentiary error established on appeal resulted in prejudice and necessitates a new trial.

erroneous jury instruction presents a question of law that is reviewed for correctness, "without deference to the trial court." *State v. Jeffs*, 2010 UT 49, ¶ 16, 243 P.3d 1250.

¶20 Finally, Cegers contends that the district court erred by denying his request for in camera review of M.F.'s medical records. "Whether a trial court errs in denying a motion for access to a victim's mental health records is a question of privilege." *State v. J.A.L.*, 2011 UT 27, ¶ 21, 262 P.3d 1. A district court's determination regarding the existence of a privilege or an exception to that privilege also presents a question of law that we review for correctness. *Id.*

ANALYSIS

I. The Counselor's Testimony

¶21 Cegers argues that the district court improperly admitted testimony from M.F.'s high school counselor that impermissibly bolstered M.F.'s allegations in violation of rule 608(a) of the Utah Rules of Evidence. Cegers failed to properly raise this issue in the district court. "A proper objection puts the judge on notice of the asserted error and allows the opportunity for correction at that time in the course of the proceeding." *State v. Dean*, 2004 UT 63, ¶ 13, 95 P.3d 276 (quotation simplified). Here, Cegers objected to the counselor's trial testimony because the counselor "was speculating about what's in somebody else's mind." After overruling the objection and permitting the counselor to continue testifying, the district court instructed the jury that it could not credit the counselor's testimony as though "she has the ability to know what another person is thinking." Neither Cegers's objection to nor the district court's instruction about the counselor's testimony invoked rule 608(a) or mentioned bolstering, indicating that Cegers failed to adequately communicate the basis for his objection. Cegers's objection did

not put the district court on notice and consequently failed to preserve the issue for appeal. *See id.* But because we agree with Cegers that the plain error exception to the preservation rule applies to the circumstances of this case, we review the court's admission of the challenged testimony for plain error. *See State v. Adams*, 2000 UT 42, ¶ 9, 5 P.3d 642.

¶22 "In order to obtain a new trial under the doctrine of plain error, [a defendant] must show that the district court committed error, that the error should have been obvious to the district court, and that the error prejudiced [the defendant] by creating a reasonable likelihood of a less favorable result." *State v. Bragg*, 2013 UT App 282, ¶ 29, 317 P.3d 452. "If any one of these requirements is not met, plain error is not established." *State v. Diaz-Arevalo*, 2008 UT App 219, ¶ 13, 189 P.3d 85 (quotation simplified). Because Cegers has met all three requirements, we conclude that he is entitled to a new trial.

## A.    Error

¶23 Cegers contends that the district court committed error when it allowed the counselor to testify that she did not believe M.F. would have fabricated her allegations against Cegers to get a school scholarship. Under rule 608(a) of the Utah Rules of Evidence, once a witness's character for truthfulness has been attacked, that witness's credibility may be "supported by testimony about the witness's reputation for having a character for truthfulness . . . , or by testimony in the form of an opinion about that character." Utah R. Evid. 608(a). But "rule 608(a) prohibits any testimony as to a witness's truthfulness on a particular occasion." *State v. Bragg*, 2013 UT App 282, ¶ 31, 317 P.3d 452 (quotation simplified).

¶24 Here, the counselor's opinion that the M.F. would not fabricate a story of abuse to get a scholarship was not an opinion about M.F.'s general character for truthfulness, but "a direct

opinion of another witness's truthfulness on a particular occasion." *See State v. King*, 2010 UT App 396, ¶ 44, 248 P.3d 984 (quotation simplified). This evidence is indistinguishable from testimony previously held to be inadmissible bolstering. *See, e.g.,* *State v. Adams*, 2000 UT 42, ¶ 11, 5 P.3d 642 (holding that a detective's testimony that, in his opinion, when he interviewed the victim, she did not appear to be coached was bolstering); *State v. Rimmasch*, 775 P.2d 388, 393 (Utah 1989) (holding that an expert's testimony that he did not think the victim had a motive to lie about her abuse was bolstering), *superseded by rule as stated in State v. Maestas*, 2012 UT 46, 299 P.3d 892; *State v. Vail*, 2002 UT App 176, ¶¶ 6, 15, 51 P.3d 1285 (holding that a detective's testimony that the victim displayed typical indicators of credibility and trustworthiness during her interview was bolstering); *State v. Stefaniak*, 900 P.2d 1094, 1095 (Utah Ct. App. 1995) (holding that a social worker's testimony that the victim "seemed to be quite candid about what she was telling me" was bolstering (quotation simplified)).

¶25 For example, in *Bragg*, we held that testimony from a police detective that commented on the veracity of the victim's statements during an interview was impermissible bolstering. 2013 UT App 282, ¶ 31. In *Bragg*, the testifying detective had personally interviewed the victim about the defendant's alleged sexual abuse. *Id.* ¶ 29. At trial, he testified that the victim "appear[ed] to be genuine" and did not appear to be "parroting a story." *Id.* ¶ 30 (quotation simplified). Because these statements were a "direct comment on [the victim's] truthfulness" on a particular occasion, we agreed with the defendant that the district court erred by allowing the detective's statements to be admitted. *Id.* ¶¶ 30–31.

¶26 Similarly, here, the counselor testified that she did not think that M.F. had lied about the abuse to get a scholarship. In context, the counselor was offering a "direct opinion" as to

M.F.'s truthfulness on a particular occasion, namely, when M.F. stated in her scholarship application that Cegers had abused her.

¶27 A second error occurred when the district court commented on this evidence at the conclusion of the counselor's testimony. Without prompting or input from counsel, the court instructed the jury, "You are to consider [the counselor's] testimony in that regard only to the extent that she was expressing her opinion based on the period of time that she knew the witness and the overall facts and circumstances, but not because she has the ability to know what another person is thinking."[6] The limitation—"but not because she has the ability to know what another person is thinking"—appears to have been aimed at addressing the misplaced speculation objection. However, the remainder of the instruction told the jury to weigh the counselor's testimony that M.F. had not lied to get the scholarship in light of the counselor's familiarity with M.F. and understanding of the facts and circumstances. In effect, this instruction advised the jury that it should consider the counselor's opinion bolstering M.F.'s allegations against Cegers given the counselor's close relationship with M.F.

¶28 The instruction suggests that the district court may have viewed the counselor's testimony as "testimony about the witness's reputation for having a character for truthfulness or untruthfulness," which is admissible under rule 608(a). If the counselor had testified more generally that M.F. is not the type of person who would falsely accuse someone for personal gain, the court may well have been correct to instruct the jury that the counselor's testimony could be considered "only to the extent

---

6. Unlike many instructions, which provide that a jury "may" consider certain evidence, the curative instruction here directed: "You are to consider [the counselor's] testimony. . . ."

that she is expressing her opinion"—presumably, as to M.F.'s reputation for truthfulness—"based on the period of time that she knew the witness and the overall facts and circumstances." But the counselor's testimony was limited to whether M.F. had been truthful on a particular occasion—when she alleged in her scholarship application that Cegers had abused her. *See Bragg*, 2013 UT App 282, ¶ 31 ("[R]ule 608(a) prohibits any testimony as to a witness's truthfulness on a particular occasion." (quotation simplified)). As a result, the instruction directed the jury to give weight to the counselor's opinion that M.F. had not fabricated the allegations in her scholarship application if the jury believed the counselor had sufficient knowledge of M.F. and the surrounding circumstances. Rather than ameliorate against the likelihood that the jury would consider the evidence for an improper purpose, the instruction compounded the error.

B.      Plain or Obvious

¶29     We next consider whether the error should have been plain or obvious to the district court. Unlike most cases in which the defendant argues plain error on appeal, Cegers did not simply fail to raise an objection, but instead he raised the wrong objection. By objecting to the counselor's testimony on the ground that she was "speculating about what's in somebody else's mind," Cegers misdirected the court to the rules requiring that lay witness testimony be based on firsthand knowledge. *See* Utah R. Evid. 602; *id.* R. 701; *see also* R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 571 (2018) (noting that "the common law objection of 'speculative' was commonly raised, suggesting that something about the witnesses' statement was not based on first-hand knowledge").

¶30     Although it is difficult to expect a district court to recognize an evidentiary error under such circumstances, we have previously held that the admission of testimony similar to

the counselor's was plain error. In *State v. Hoyt*, 806 P.2d 204 (Utah Ct. App. 1991), for example, we held that the admission of expert testimony that a child sexual abuse victim was "truthful in her allegations" was plainly erroneous, violating "a time-honored principle of evidence." *Id.* at 210–11 (quotation simplified). Additionally, in *State v. Adams*, 955 P.2d 781 (Utah Ct. App. 1998), we concluded, and the State conceded on appeal, that a detective's testimony that he "did not believe [the victim] had been coached" obviously violated rule 608(a). *Id.* at 785–86. Similarly, here, M.F.'s counselor testified that she did not believe M.F. was fabricating the allegations in her scholarship application. We cannot distinguish this testimony from the impermissible bolstering we have previously deemed to be plainly inadmissible.

¶31 But even were we not convinced that the counselor's testimony itself obviously violated the rules of evidence, the initial error cannot be disassociated from the court's instruction directly following this testimony. The court's subsequent instruction had the unintended consequence of exacerbating the bolstering problem by instructing the jury to consider the counselor's testimony "to the extent that she was expressing her opinion based on the period of time that she knew the witness and the overall facts and circumstances."[7] Even if the initial bolstering was insufficiently obvious to expect a district court to recognize the error and intervene sua sponte, the subsequent error in commenting on the testimony was more obvious. The

---

7. Some courts have held it plain error not to give a curative instruction when impermissible bolstering occurs. *See People v. Garrett*, No. 338311, 2019 WL 97129, at *4 (Mich. Ct. App. Jan. 3, 2019). Giving an instruction that directs the jury to consider the bolstering testimony more easily meets the definition of plain error.

curative instruction was issued after the district court had the opportunity to reflect on the admissibility of the testimony and to consider how the jury would evaluate the counselor's testimony in light of the court's directive. And the prospect of commenting on the testimony, without a request or other input from counsel, would surely give the district court pause. Under the totality of the circumstances, we conclude that the error was plain.

## C.    Prejudice

¶32    Having concluded that admission of the counselor's testimony and the court's subsequent instruction were plainly erroneous, we now determine whether the error was harmful. *State v. King*, 2010 UT App 396, ¶ 19, 248 P.3d 984. "An error is harmful if, absent the error, there is a reasonable likelihood of a more favorable outcome for the defendant or our confidence in the verdict is undermined." *State v. Perez*, 946 P.2d 724, 728 (Utah Ct. App. 1997) (quotation simplified).

¶33    In the past, we have held that the admission of testimony that impermissibly bolsters a victim's credibility is harmful when the case against a defendant "hinged entirely on the credibility of the victim." *State v. Stefaniak*, 900 P.2d 1094, 1096 (Utah Ct. App. 1995); *see also State v. Iorg*, 801 P.2d 938, 941–42 (Utah Ct. App. 1990). In *Stefaniak*, for example, we determined that the admission of bolstering testimony was prejudicial when the State produced no physical evidence of the crime or testimony from third parties who had witnessed the alleged abuse and when the victim's "report was first made several months after the incident, in the midst of domestic turmoil between the victim's mother and [the defendant]." 900 P.2d at 1096.

¶34    In contrast, in *State v. Adams*, 2000 UT 42, 5 P.3d 642, our supreme court determined that the defendant was not

prejudiced by the admission of impermissible bolstering testimony when "the record reveal[ed] ample evidence upon which the jury could have convicted" the defendant of forcible sexual abuse. *Id.* ¶ 21. In addition to the victim's testimony, the State had offered testimony from the victim's mother that she saw the defendant leaving the victim's room naked; testimony from the defendant that he was intoxicated and did not remember the incident; and testimony from a doctor that the victim suffered from severe intellectual disabilities, making it improbable that she fabricated her allegations. *Id.* ¶¶ 21–22.

¶35 Here, the facts more closely resemble those in *Stefaniak* than those in *Adams*. The only direct evidence of Cegers's abuse of S.B. and M.F. was their own testimony. They both described similar incidents in which Cegers touched or attempted to touch their genitals while they were asleep or about to fall asleep. As is often the case with sexual abuse, the State had no other evidence to corroborate the victims' allegations. Neither S.B.'s mother, nor brother, nor her friend testified that they had witnessed any sexually abusive or suspicious behavior by Cegers. M.F.'s mother testified that she never suspected that Cegers was sexually abusing her daughter and that she was surprised when M.F. disclosed the abuse to her. M.F. herself testified that she never witnessed Cegers behave in a sexually inappropriate manner toward S.B., even though S.B. testified that M.F. was in the room during some of the incidents of abuse. Cegers also categorically denied both victims' allegations. And although the school counselor had been meeting with M.F. for some time, she testified that M.F. had never reported the abuse to her before.

¶36 In addition, M.F. provided conflicting reports to the police about Cegers's abuse. When the police spoke with her after S.B. reported Cegers's abuse, M.F. denied that Cegers had ever touched her inappropriately. When she reported her own abuse

years later, M.F. alleged that Cegers had been abusing her since she was five, well before her first conversation with the police about Cegers. Furthermore, just as in *Stefaniak*, M.F. reported her abuse "in the midst of domestic turmoil" between her mother and the alleged perpetrator of her abuse. *See* 900 P.2d at 1096.

¶37    Given that the jury's verdict hinged on its assessment of the victims' credibility, the counselor's testimony bolstering M.F.'s credibility carried significant weight, made heavier by the district court's instruction to the jury that it could consider the counselor's "opinion based on the period of time that she knew the witness and the overall facts and circumstances." This instruction suggested that the jury should weigh the counselor's opinion as to whether M.F. should be believed in light of the counselor's testimony that she had spent considerable time with M.F. and was aware of the circumstances of her personal and family life. In effect, the district court inadvertently instructed the jury to consider the counselor's testimony in precisely the manner rule 608 prohibits.

¶38    If the jury credited the counselor's testimony that M.F. had been honest when reporting the abuse, it was not only more likely to believe M.F.'s account but also more likely to believe S.B.'s similar allegations against Cegers. M.F.'s allegations of abuse carried the implication that Cegers had a propensity to sexually abuse minor females and suggested that it was more likely that S.B. was abused in a similar manner. *See State v. Ring*, 2018 UT 19, ¶ 30, 424 P.3d 845 (stating that evidence that the defendant had committed other similar child sex abuse offenses suggested that "he had the propensity to commit the alleged crime"). As a result, the potentially prejudicial impact of the inadmissible testimony was not limited to the counts involving M.F. Rather, there is a reasonable probability that the counselor's testimony bolstering M.F.'s allegations influenced the jury's decision to convict Cegers of sexual abuse against S.B. as well.

¶39    In light of these facts, "we cannot say that absent the error there is not a reasonable likelihood of a more favorable result." *See Iorg*, 801 P.2d at 942. "This case depended on the jury's assessment of the victim[s'] credibility versus the defendant's, and there is not other evidence to support the defendants' conviction[s] beyond that which is tainted by improper testimony." *See Stefaniak*, 900 P.2d at 1096 (quotation simplified). We therefore conclude that Cegers was prejudiced by the admission of the counselor's impermissible bolstering testimony and accordingly reverse on this issue.

## II. Sufficiency of the Evidence

¶40    Next, Cegers argues that the district court erred when it denied his motion for a directed verdict because the testimony of M.F. and S.B. was incredible or "inherently improbable" and was therefore insufficient to sustain his convictions. We disagree.

¶41    "When the evidence presented [at trial] is conflicting or disputed, the jury serves as the exclusive judge of both the credibility of witnesses and the weight to be given particular evidence." *State v. Workman*, 852 P.2d 981, 984 (Utah 1993). As a result, "we are not . . . in the business of reassessing or reweighing evidence, and we resolve conflicts in the evidence in favor of the jury verdict." *State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398 (quotation simplified). But in "unusual circumstances, . . . the testimony presented to the jury [can be] so unreliable that it cannot form the basis of a conviction." *Id.* (quotation simplified). "[S]uch an unusual circumstance exists when witness testimony is so inconclusive or inherently improbable that it could not support a finding of guilt beyond a reasonable doubt." *Id.* (quotation simplified).

¶42    Testimony is inherently improbable when it describes "an action that was physically impossible" or is "manifestly false

'without any resort to inferences or deductions.'" *Id.* (quoting *Workman*, 852 P.2d at 984). Inherently improbable testimony also includes "circumstances where a witness's testimony is incredibly dubious and, as such, apparently false." *State v. Robbins*, 2009 UT 23, ¶ 18, 210 P.3d 288. For example, in *Robbins*, the combination of "the inconsistencies in the child's testimony *plus* the patently false statements the child made *plus* the lack of any corroboration" led our supreme court to conclude that the child's testimony was "apparently false" and insufficient to support the convictions. *Prater*, 2017 UT 13, ¶¶ 38–39 (discussing *Robbins*, 2009 UT 23, ¶ 22).

¶43 Cegers contends that, like the testimony in *Robbins*, the testimony of both M.F. and S.B. was inconsistent, contained patently false statements, and lacked corroboration. While S.B. and M.F. describe similar instances of abuse, and thereby corroborate each other to some degree, it is true that neither S.B. nor M.F.'s testimony is independently supported by other corroborating evidence. *See supra* ¶ 35. In addition, we recognize that M.F. initially denied the abuse occurred, which was certainly inconsistent with her trial testimony. *See supra* ¶ 36. But "pre-trial inconsistent statements do not render [a witness's] testimony 'apparently false.'" *Prater*, 2017 UT 13, ¶ 39. "The question of which version of [M.F.'s story] was more credible is the type of question we routinely require juries to answer." *See id.*

¶44 Moreover, Cegers has not shown that the victims' testimony contained "patently false statements." Cegers first argues that S.B.'s testimony that Cegers abused her when M.F. was present was patently false because M.F. testified that she never witnessed any abuse. The mere fact that M.F. did not see the abuse does not make S.B.'s testimony patently false, especially when S.B. testified that Cegers touched her in a surreptitious manner, by reaching under a blanket or between

her body and a countertop, and when S.B. never claimed that M.F. had actually witnessed the abuse.

¶45 Cegers also contends that M.F.'s testimony was patently false because she disclosed to her counselor that Cegers told her, "do me," but she did not recount this detail in her own testimony at trial. Testimony is not patently false merely because it fails to include every detail contained in the witness's prior statements. M.F. did not deny that she made this statement to the counselor nor did she testify in a manner that contradicted this prior statement.

¶46 Finally, Cegers contends that because "[M.F.] had a significant motive to fabricate after her mother's breakup with Cegers left them without a house," her allegations were patently false. A motive to lie does not "automatically render [a witness's] testimony apparently false." *Prater*, 2017 UT 13, ¶ 41. Instead, it "goes to the weight and credibility of the testimony." *Id.* Cegers had an adequate opportunity to present this theory to the jury and to attack M.F.'s credibility on this basis. "[W]e will not act as a second trier of fact." *Id.* (rejecting the defendant's argument that the witnesses' motive to lie in return for a plea bargain "automatically render[ed] their testimony apparently false" where defense "counsel had every opportunity to attack the witnesses' credibility because of the plea deals and to argue accordingly in front of the jury").

¶47 Cegers has not established that this is an "unusual circumstance" where "the testimony presented to the jury was so unreliable that it cannot form the basis of a conviction." *See id.* ¶ 32. Although the credibility challenges in this case weighed heavily in favor of finding the evidentiary error prejudicial, nothing about the victims' testimony was "apparently false." Unlike the testimony in *Robbins*, the testimony of the victims was neither internally inconsistent nor patently false. Therefore,

Cegers has not demonstrated that the victims' testimony was so inconclusive or inherently improbable that no reasonable jury could have relied upon such evidence to convict. Accordingly, the district court properly declined to second-guess the jury's credibility determinations and denied Cegers's motion for a directed verdict.

## III. Jury Instruction

¶48 Cegers also argues that the district court committed reversible error "when it instructed the jury that, although specific intent was an element of the crime of sexual abuse, a mental state as low as recklessness was sufficient." "The general rule for jury instructions is that an accurate instruction upon the basic elements of an offense is essential," *State v. Bird*, 2015 UT 7, ¶ 14, 345 P.3d 1141 (quotation simplified), but we also review "the jury instructions in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case," *State v. Lambdin*, 2017 UT 46, ¶ 41, 424 P.3d 117 (quotation simplified). We conclude that, taken as a whole, the jury instructions at issue here fairly represented the applicable law and accurately instructed the jury as to the elements of sexual abuse of a child and forcible sexual abuse.

¶49 Under Utah Code sections 76-5-404.1(2) and 76-5-404(1), which enumerate the elements of sexual abuse of a child and forcible sexual abuse, the State is required to prove beyond a reasonable doubt that the defendant committed either offense with the intent to "cause substantial emotional or bodily pain to any individual or with the intent to arouse or gratify the sexual desire of any individual." But, as our supreme court has previously acknowledged, the crime of forcible sexual abuse "contains two elements of intent: a general intent to take indecent liberties or touch the anus or genitals of another without that person's permission and the specific intent or

purpose to cause substantial emotional or physical pain or to sexually arouse or gratify any person." *Adams v. State*, 2005 UT 62, ¶ 21, 123 P.3d 400 (quotation simplified). Citing *Adams*, this court has similarly acknowledged that the offense of sexual abuse of a child requires proof that a defendant had both the "general intent to touch and a specific intent to cause pain or to arouse or gratify sexual desires." *State v. Sellers*, 2011 UT App 38, ¶ 5, 248 P.3d 70; *see also State v. Carrell*, 2018 UT App 21, ¶ 27, 414 P.3d 1030 (stating that the Model Utah Jury Instructions for sexual abuse of a child, which includes both a general and a specific intent requirement, "correctly state the law").

¶50 Here, the jury was instructed as to both intent requirements for each of the forcible sexual abuse and sexual abuse of a child charges against Cegers. In relevant part, instructions 27 and 28, which mirror the Model Utah Jury Instruction, instructed the jury that it could convict Cegers of sexual abuse of a child only if it found beyond a reasonable doubt that Cegers:

> 2. Intentionally, knowingly, or recklessly:
>> a. touched the anus, buttocks, or genitals, of [M.F. and S.B.], even if accomplished through clothing; or
>> b. touched [M.F.'s and S.B.'s] breast[s], even if accomplished though clothing; or
>> c. took indecent liberties with [M.F. and S.B.]; or
>> d. caused [M.F. and S.B.] to take indecent liberties with [Cegers] or another; and
> 3. Did so with the intent to:
>> a. cause substantial emotional or bodily pain to any person; or
>> b. arouse or gratify the sexual desire of any person; and

4. [M.F. and S.B. were] under 14 years old at the time of the conduct.

Similarly, in relevant part, instruction 29 instructed the jury that it could convict Cegers of forcible sexual abuse only if it found beyond a reasonable doubt that Cegers:

2. Intentionally, knowingly, or recklessly:
a. touched the skin of [M.F.'s] anus, buttocks, or genital; or
b. touched the skin of [M.F.'s] breast; or took indecent liberties with M.F.; or
d. caused [M.F.] to take indecent liberties with [Cegers];
3. Without [M.F.'s] consent;
4. [Cegers] acted with intent, knowledge or recklessness that [M.F.] did not consent;
5. Did so with the intent to:
a. cause substantial emotional or bodily pain to any person, or
b. arouse or gratify the sexual desire of any person[.]

¶51 Cegers contends that these instructions were erroneous both because they (1) misstate the law with regard to the crimes of sexual abuse of a child and forcible sexual abuse, and (2) likely misled the jury into believing that the State only needed to prove that Cegers acted "knowingly" or "recklessly" with respect to all elements and did not need to prove specific intent. We disagree with both of Cegers's arguments.

¶52 Instructions 27, 28, and 29 accurately state the law relating to forcible sexual abuse and sexual abuse of a child. The statutes proscribing both offenses prohibit conduct that is carried out with the specific intent to cause substantial emotional or bodily pain or gratify sexual desire. *See* Utah Code Ann. § 76-5-404.1(2);

*id.* § 76-5-404(1). And although neither statute expressly attaches a general intent requirement to the touching or indecent liberties elements, our courts have interpreted both statutes to contain two intent requirements: a general intent to touch and a specific intent to cause pain or to arouse or gratify sexual desires. *See Adams*, 2005 UT 62, ¶ 21 (stating that the offense of forcible sexual abuse "contains two elements of intent: a general intent to take indecent liberties or touch the anus or genitals of another without that person's permission and the specific intent or purpose to cause substantial emotional or physical pain or to sexually arouse or gratify any person" (quotation simplified)); *Sellers*, 2011 UT App 38, ¶ 5 (stating that the offense of sexual abuse of a child requires proof that a defendant had both the "general intent to touch and a specific intent to cause pain or to arouse or gratify sexual desires").

¶53 In addition, we do not agree that the inclusion of "intentionally, knowingly, or recklessly" along with "with the intent to cause substantial emotional or bodily pain to any person, or arouse or gratify the sexual desire of any person" in the same instruction misled the jury into believing the latter intent did not apply. Although the district court instructed the jury that it had to find that Cegers "intentionally, knowingly, or recklessly" touched, took indecent liberties with S.B. and M.F., or caused S.B. and M.F to take indecent liberties, the jury was also instructed that it had to find that Cegers "did" those acts with the specific intent prescribed by sections 76-5-404.1(2) and 76-5-404(1). Indeed, in all three instructions, the requirement that Cegers "did so with the intent to cause substantial emotional or bodily pain to any person, or arouse or gratify the sexual desire of any person" is listed as a separate element of the offense. Consequently, the instructions necessarily required the jury to find, beyond a reasonable doubt, that Cegers acted with specific intent to cause substantial emotional or bodily pain or gratify sexual desire.

¶54   Because the jury instructions at issue here neither misstated the applicable law nor misled the jury, the district court did not err in instructing the jury as to the intent requirements of forcible sexual abuse and sexual abuse of a child.

## IV. M.F.'s Medical Records

¶55   Finally, Cegers argues that the district court erred when it denied his request for an in camera review of M.F.'s medical records, specifically, records "addressing medical treatment related to M.F.'s suicide attempt on or about March 10, 2013." Because Cegers failed to show that the medical records contained evidence that M.F. experienced a mental or emotional condition supporting an element of his defense, we conclude that the district court correctly denied Cegers's request for in camera review.

¶56   Under rule 506 of the Utah Rules of Evidence, patients have a presumptive "privilege . . . to refuse to disclose and to prevent any other person from disclosing information that is communicated in confidence to a physician or mental health therapist for the purpose of diagnosing or treating the patient." Utah R. Evid. 506(b). Nevertheless, there are circumstances under which "otherwise privileged communications between a crime victim and her [physician or mental health] therapist might be subject to in camera review and disclosure." *State v. Blake*, 2002 UT 113, ¶ 19, 63 P.3d 56. Two showings are required to be entitled to in camera review. First, the proponent must show that communications between the patient and physician or mental health therapist are "relevant to an issue of the physical, mental, or emotional condition of the patient" and support "an element of any claim or defense." Utah R. Evid. 506(d)(1)(A). Second, the proponent must show "with reasonable certainty" that "exculpatory evidence exists [within the communications]

which would be favorable to [the] defense." *State v. Cardall*, 1999 UT 51, ¶ 30, 982 P.2d 79.

¶57    In this case, Cegers failed to make the first showing. "[T]he threshold test of a rule 506(d)(1) exception is whether the party seeking in camera review of privileged records has sufficiently alleged that the witness'[s] mental or emotional condition itself is an element of any claim or defense." *State v. Worthen*, 2009 UT 79, ¶ 19, 222 P.3d 1144. In other words, a district court must first "determine whether the patient suffers from a physical, mental, or emotional *condition* as opposed to mental or emotional problems that do not rise to the level of a condition" before engaging in further analysis of the request for in camera review. *State v. J.A.L.*, 2011 UT 27, ¶ 48, 262 P.3d 1. Under the rule 506(d)(1) exception to the medical records privilege, a physical, mental, or emotional condition is more than a "mere expression[] of emotion" that is "transitory or ephemeral." *Worthen*, 2009 UT 79, ¶ 21. Rather, "[a] mental or an emotional condition is a state that persists over time and significantly affects a person's perceptions, behavior, or decision making in a way that is relevant to the reliability of the person's testimony." *Id.* Thus, "'condition' denotes a longer-lasting mental state than momentary 'emotion,' 'feeling,' or 'pain.'" *Id.* (quotation simplified).

¶58    Analyzing the "condition" requirement of rule 506(d)(1), our supreme court has decided two cases that inform our analysis of Cegers's request for in camera review of M.F.'s medical records. First, in *Cardall*, the supreme court addressed circumstances where a defendant charged with rape of a child requested review of the alleged victim's "school psychological records," including an "anxiety exam" administered by a school counselor and any information pertaining to the victim's prior false allegations of sexual abuse against the school janitor. 1999 UT 51, ¶ 10 (quotation simplified). The court concluded that the

defendant had met his burden of showing that the subject of the requested records experienced a "physical, mental, or emotional condition" that supported an element of his defense by asserting that the victim was "a habitual liar, that she fabricated her story about being raped, that she is mentally and emotionally unstable, and that the records show that on at least one previous occasion these psychological traits led her to lie about an attempted rape or sexual touching by the school janitor." *Id.* ¶ 29. In a subsequent case, *Worthen*, our supreme court explained that the *Cardall* court had "seized upon the term 'psychological traits' to describe [the defendant's] assertions that his alleged victim was a habitual liar, a fabricator, and mentally and emotionally unstable" and, "[t]ellingly, these psychological traits were accompanied by false allegations of sexual misconduct against a school janitor." 2009 UT 79, ¶ 23. The court noted it was "more likely than not that none of the victim's traits, taken alone, would have established the existence of an emotional condition." *Id.*

¶59    In *Worthen*, the supreme court determined that the victim's "'frustration with, and hatred toward' her parents [was] an emotional condition contemplated by [rule 506(d)(1)]." *Id.* ¶ 28. The defendant, who was the adoptive father of the alleged victim, argued that the victim harbored "extreme hatred toward[] her parents, which drove her to explore a way to escape [their] home[,] . . . motivated her attempted suicide, found voice in her violent journal entries, and led her to fabricate abuse allegations." *Id.* ¶ 25. To support this claim, the defendant requested in camera review of the victim's medical records for communications pertaining to the victim's prior denial of abuse by the defendant, "cognitive problems and major misinterpretation problems," and "motive to fabricate the allegations stemming from her hatred of her parents." *Id.* ¶ 6 (quotation simplified). Our supreme court concluded that because the victim "demonstrated persistent hostility toward[]

her parents and repeatedly expressed her desire to leave the home," "the chronic and persistent nature" of her anger and hatred amounted to a condition, which was an element of the defense's claim that the victim had a motive to fabricate allegations of abuse. *Id.* ¶ 28. The court stressed, however, "that the fact that [the victim] may have made statements to her therapist that simply conveyed her emotions or feelings does not by itself constitute a mental or emotional condition under the rule merely because those communications may be used for specific impeachment purposes." *Id.* ¶ 29. The court added, "[i]f feelings themselves were to constitute a mental or emotional condition, the exception to the psychotherapist-patient privilege would devour the privilege." *Id.* ¶ 27.

¶60 Here, Cegers has not demonstrated that the communications contained in M.F.'s medical records reflect a "condition." He represents that the hospital records turned over by the State show that M.F. "reported at the time of her suicide attempt that her depression was 'occasioned by increased fights with [Cegers] over household chores and being able to spend time with her friends' and she had suicidal thoughts due to ongoing marital discord and the threat of [Cegers and her mother] separating." But Cegers does not contend that M.F.'s depression, by itself, is relevant to an element of his claim or defense. Rather, he contends that "frustration with Cegers over his management of the household and his relationship with [M.F.'s] mother" rose to the level of a "diagnosable condition," adding that "[d]epression based on parental discord and frustration over Cegers's management of the household is the kind of condition contemplated in *Worthen*."

¶61 Although persistent depression may be a mental or emotional condition, Cegers does not claim that M.F.'s depression was the condition that led to the allegedly false accusations of sexual abuse. Unlike the "psychological traits" in

*Cardall* and *Worthen* that made it more likely that the victims may have fabricated their stories, Cegers did not claim that M.F.'s depression affected her "perceptions, behavior, or decision making in a way that is relevant to the reliability of [her] testimony." *See Worthen*, 2009 UT 79, ¶ 21. Instead, Cegers argued that M.F.'s negative feelings toward Cegers—not her depression—motivated her to lie. The statements M.F. made to mental health professionals regarding those feelings might have been used to impeach her at trial, but "feelings themselves are not a mental or emotional condition contemplated under the rule." *Id.* ¶ 27.

¶62 Ultimately, this case is distinguishable from *Cardall* and *Worthen* because Cegers has not alleged that M.F. suffered from a psychological condition that would cause her to fabricate sexual abuse allegations. *See Cardall*, 1999 UT 51, ¶ 29; *see also Worthen*, 2009 UT 79, ¶ 23. The alleged motivation for M.F. to lie relates not to a chronic and persistent "condition," but to her expressed feelings about Cegers. Such feelings alone do not constitute a mental condition under rule 506(d)(1). To hold otherwise would expand the exception to an important privilege so far as to "devour the privilege" itself. *See Worthen*, 2009 UT 79, ¶ 27. We agree with the district court that "a showing hasn't been made that the kind of condition contemplated by rule 506(d)(1) has been established in this case" and affirm its denial of Cegers's request for in camera review.

CONCLUSION

¶63 We conclude that the district court did not err in denying Cegers's motion for a directed verdict, in instructing the jury as to the intent elements of sexual abuse of a child and forcible sexual abuse, and in denying Cegers's request for in camera review of M.F.'s medical records. However, because Cegers has

established that the admission of the counselor's bolstering testimony was plain error, we vacate his convictions and remand to the district court for a new trial.

_____