2024 UT App 43

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOSE FELIPE ARCE,
Appellant.

Opinion
No. 20220006-CA
Filed March 28, 2024

First District Court, Logan Department
The Honorable Brandon J. Maynard
No. 191100762

Freyja Johnson, Emily Adams, and
Hannah Leavitt-Howell,
Attorneys for Appellant, assisted by law student
Ryder Seamons[1]

Sean D. Reyes and Marian Decker,
Attorneys for Appellee, assisted by law student
Rebecca Barker

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1     A domestic dispute ensued on an emotional evening after
Jose Felipe Arce had returned home from attending the birth of a
child he believed he fathered as a result of an affair. Arce does not
dispute that an argument occurred. He denies, however, that he
hit or choked his spouse (Wife). This appeal centers on Wife's
statements near the time of the event and her complete

---

1. S*ee* Utah R. Jud. Admin. 14-807 (governing law student practice
in the courts of Utah).

recantation at trial. Arce claims numerous errors, including that the trial court should not have allowed the State to compel Wife to invoke her Fifth Amendment right 47 times in front of the jury, a deputy should not have been allowed to vouch for a particular version of Wife's testimony, the State and a witness should not have used the word "victim" 29 times, and these errors cumulatively prejudiced him. Although we do not endorse the approach taken by the trial court or the parties, we affirm the convictions.

## BACKGROUND

¶2      The State charged Arce with, and the jury convicted him on, one count of aggravated assault (domestic violence) and five counts of domestic violence in the presence of a child. At the center of this appeal are the different versions of events as related by Wife. We recite the facts in a light most favorable to the jury's verdict. *See State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346.

*Alleged Assault and Wife's Statements in the Subsequent Hours and Days*

¶3      In July 2019, Arce visited the hospital for the birth of a child whom both Arce and Wife believed he may have fathered with another woman. Wife described the day as an emotional one filled with tears. When Arce returned from the hospital, the couple decided to take their kids swimming at a hot springs resort. The couple talked about the difficult situation on the drive there, with more crying from Wife. On the drive home, their conversation escalated into an argument while the children slept in the back seat. After Arce asked for forgiveness, Wife said she had forgiven him for "many things" but "this was just too much." Arce pulled the car over, and Wife said that the two "couldn't be together anymore." Wife later told police and neighbors that after pulling over, Arce hit and choked her.

¶4 Arce then drove the family home, and he told the children to go inside. Wife later told police and neighbors that, as they continued arguing, Arce hit her, threw her to the ground, kicked her, pulled her hair, tried to choke her, and threatened to hit her with a beer bottle.

¶5 At this point, Wife ran to her neighbor's (Neighbor) home. Neighbor could hear Arce yelling as she opened the door to find Wife out of breath, shaking, and crying. Wife was in a t-shirt with no pants. Neighbor and her husband (Neighbor's Husband) believed Wife was seeking safety. Wife told them Arce was trying to hurt her. She also told the couple she wanted Arce out of the house. She then recounted the earlier fight that had happened during the drive home, including that after arriving home Arce had hit and kicked her and tried to choke her. Neighbor did not see any injuries on Wife. Neighbor's Husband said that he saw "a red mark kind of on her collarbone on her left side."

¶6 Neighbor's Husband, a deputy sheriff, called police, who arrived fewer than ten minutes later. The responding officer (Deputy) interviewed Wife at Neighbor's home that evening. Deputy testified that Wife appeared "extremely distraught," "frantic," and "emotionally distressed" and that she continuously wiped her eyes and nose from crying. During the interview, Wife told Deputy that Arce both struck and choked her. She also recounted that after returning home, Arce dragged her out of the car by her hair, threatened to hit her with a beer bottle, choked her, and slapped her. Deputy observed that the area under Wife's right eye was "somewhat swollen" and that she had "some sort of reddish mark" on her collarbone that looked like it was beginning to bruise.

¶7 By that time, Arce had left the scene. Wife signed a request for a no-contact order and, with her children, went to emergency housing that the Deputy arranged. Wife also completed a lethality assessment. In the assessment, Wife indicated that she thought

Arce might try to kill her. In an additional comment section, Wife noted that "having [Arce] at the home was a concern of safety for her."

¶8 The following day, a police officer (Detective) interviewed Wife at her work. Wife again recounted the events, including Arce choking her, slapping her, grabbing her hair, throwing her to the ground, and threatening to hit her with a bottle. Wife also filled out a written statement during the interview with Detective recounting these same allegations. The top of the statement gave the following warning, "You are notified that the statements you are about to make may be presented to a magistrate or a judge in lieu of your sworn testimony at a preliminary examination. Any false statements you make and that you do not believe to be true may subject you to criminal punishment as a Class A Misdemeanor." Wife signed the statement.

¶9 That same night, Deputy interviewed Arce by phone. Arce explained that he and Wife had taken the children to the resort "to have a good day" but Wife kept bringing up the infidelity and birth of the baby, so the two argued. Arce said that during the argument, he went through Wife's phone, saw messages from another man, and asked, "[W]ho the f*** is this person?" When asked if he hit or choked Wife, Arce responded that he did not recall. Arce did, however, say that there was a miscommunication between them and that there was "some pushing and shoving."

*Wife's Recantation and Testimony at Trial*

¶10 The same day that Detective interviewed Wife, Deputy listened to a voicemail from Wife asking that all charges be dropped. When Wife later spoke with Deputy on the phone, she again asked that the charges be dropped. Wife explained that Arce "had a good job and that she needed help with the five children."

¶11 At trial, Wife testified consistently with the prior statements she had made to law enforcement and her neighbors,

however, she insisted that she made up the allegations of domestic violence against Arce. From the stand, Wife said, "This is why I wanted to just come up here because I hear all the charges and it's really very selfish of me, you know. So this is why I'm sitting up here and I'm saying what really happened." Wife testified that all the events occurred as she explained to law enforcement and the neighbors but that Arce never hit or choked her. Wife testified that after telling Arce they could not be together anymore, she told him to take her home, and he did. Wife testified that she opened the car door and sat on the edge of her seat while they continued arguing and yelling at one another but no physical altercation occurred.

¶12 When the State began asking her questions about police arriving the night of the incident and what she told them, the court stopped the questioning and excused the jury. The court explained to Wife that she had a right not to incriminate herself and that doing so would open her up to prosecution. The State asserted several times, "We won't charge her." The State also served Wife with a written notice of use immunity for purposes of the trial.[2] And the court provided her with the opportunity to speak with an attorney. Subsequently, Wife was appointed counsel.

¶13 Following a recess, the State asked that Wife be declared a hostile witness, allowing it to ask her leading questions, which the court granted. After speaking with his client, Wife's counsel advised the court that Wife would be exercising her Fifth Amendment right moving forward. The State argued that the immunity it had offered Wife would protect her and that it was not the State's intent "to ask the Court to hold [Wife] in this case

---

2. A "grant of use immunity [prohibits] any prosecutorial use of [a witness's] testimony or evidence gained from it" against the witness. *State v. Morris*, 2017 UT App 112, ¶ 17, 400 P.3d 1183, *cert. denied*, 409 P.3d 1049 (Utah 2017).

in contempt" for refusing to testify. Wife's counsel argued that the notice of use immunity was inadequate to protect her because it expressly did not grant immunity against a future perjury prosecution. The State again asked the court to treat Wife as a hostile witness. Arce's counsel objected, arguing that the State knew weeks in advance that Wife might invoke her Fifth Amendment right. The State argued that knowing what Wife would do for weeks in advance was "a little bit of a stretch" and that its grant of use immunity was sufficient.

¶14 During further argument over whether to allow the State to treat Wife as a hostile witness, the State again said it would not seek to have the court hold her in contempt. The court ultimately granted the State's request and received affirmation again from the State that it would not ask the court to hold Wife in contempt if she refused to testify.

¶15 The next day, the State retracted its written immunity offer and explained that it planned to ask Wife questions to which she could "choose to invoke the Fifth or to respond." Wife's counsel objected, arguing, "[T]he State's going to try to . . . present their case by asking those questions and hearing the Fifth . . . . [T]hat's just them trying to testify to the jury by the questions they're asking." The court disagreed, explaining that anything the State said was not evidence and that Wife could not make a "blanket" invocation of her Fifth Amendment right.

¶16 When Wife took the stand again, she invoked the Fifth Amendment 47 times in response to the State's questions.[3] The State's questions included asking Wife about the same things she had addressed the day before, prior to invoking her constitutional right to silence. Arce's counsel did not object to or seek to limit the

---

3. The State argues that she invoked the Fifth Amendment 45 times, but the discrepancy of two invocations is not dispositive in this case, so we will use Arce's number moving forward.

State's leading questions or Wife's invocations; neither did he request a mistrial.

*Other Testimony at Trial*

¶17    During the trial, the State called Neighbor, Neighbor's Husband, Deputy, and Detective to the stand; each recounted the events and gave consistent testimony of the statements Wife made to them concerning the events during the evening in question—including the physical abuse she allegedly experienced at the hands of Arce.

¶18    During Deputy's examination, the State asked, "And so ultimately what did your investigation lead you to believe happened that night?" Defense counsel made no objection. Deputy responded, "Based off all my observations and interview, I believe that the victim had been struck and choked and that there was a domestic violence assault that occurred." The State then asked, "And I just want to emphasize, why is it that you believed that this truly happened?" Defense counsel again made no objection. Deputy answered,

> I believe it truly happened given a number of things. Mainly, when I spoke to [Wife], she appeared to be honest and genuine in the emotion that she was describing things with was clearly emotional distress, upset that I've seen. And not every case is the same. I've seen other people who have been victims of assault act similar, so that's why I believed it. She appeared to be honest and genuine.

¶19    During Detective's testimony, the State moved to admit into evidence Wife's written statement that was given under penalty of perjury, which the court allowed.

¶20    The State also called two expert witnesses. A clinical psychologist testified about patterns of domestic violence and that

individuals experiencing abuse frequently stay in the relationship and/or recant their previous stories. And a pediatric nurse practitioner testified about strangulation, including that in over 50% of strangulation cases there are no visible injuries.

¶21 Throughout the trial, the State, Deputy, and Detective referred to Wife as "the victim" 29 times. And the State and its witnesses—primarily the clinical psychologist—used the term "victim" or "victims" generally an additional 45 times. The State also referred to Wife as the "alleged victim," primarily during jury selection but also sporadically throughout the trial.

*Closing Arguments and Verdict*

¶22 In closing arguments, the State argued that the jury should believe Wife's original statements to her neighbors and police as those were made instinctually to keep her family safe from a threat rather than out of "selfish[ness] or insincer[ity]." The defense argued that Wife had every reason to hate Arce but she wanted to set the record straight about her lies concerning the events of that night and that the State's case fell apart without her lies.

¶23 During deliberation, the jury asked for access to the State's "questions on day 2 to [Wife] when she pled the fifth." The court did not grant the request.

¶24 The jury convicted Arce on all charges. Arce now appeals.

ISSUES AND STANDARDS OF REVIEW

¶25 Arce raises three issues on appeal. First, Arce argues that the trial court incorrectly allowed the State to compel Wife to invoke her Fifth Amendment right 47 times in front of the jury. We give trial courts "broad discretion to admit or exclude evidence, including lay witness testimony, and will disturb [a trial

court's] ruling only for abuse of discretion." *State v. Perea*, 2013 UT 68, ¶ 31, 322 P.3d 624 (cleaned up). But the trial court must correctly interpret and apply the law. *Id.* ¶ 30. We review "the legal questions underlying the admissibility of evidence" for correctness. *Dierl v. Birkin*, 2023 UT App 6, ¶ 15, 525 P.3d 127 (cleaned up), *cert. denied*, 527 P.3d 1107 (Utah 2023).

¶26 Second, Arce argues that he received constitutionally ineffective assistance of counsel when his counsel (1) did not seek to limit or remediate the continued questioning of Wife by objecting, moving to strike both the questions and invocations, or asking for a curative instruction; (2) failed to object to Deputy improperly opining on and vouching for the credibility of Wife's report the night of the incident; and (3) failed to object to the State and witnesses referring to Wife as "the victim" 29 times during the trial. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Reid*, 2018 UT App 146, ¶ 17, 427 P.3d 1261 (cleaned up), *cert. denied*, 432 P.3d 1225 (Utah 2018).

¶27 Finally, Arce argues that under the cumulative error doctrine, the evidentiary error and ineffective assistance of counsel Arce received should undermine our confidence in the outcome of the trial. "We will reverse a jury verdict or sentence only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. Lopez*, 2019 UT App 11, ¶ 22, 438 P.3d 950 (cleaned up).

ANALYSIS

I. Evidentiary Ruling

¶28 Arce argues that the trial court improperly overruled Wife's counsel's objection to the State questioning Wife despite

knowing that she would invoke her Fifth Amendment right. Here, the trial court did not expressly say why it allowed the State, knowing Wife would invoke her constitutional privilege, to continually examine Wife. After Wife met with counsel and determined that she would invoke her Fifth Amendment right moving forward, the State asked the court to declare Wife a hostile witness and allow the State to continue examining her with leading questions. Wife's counsel objected to declaring her hostile, arguing that the State already knew she would invoke her right for each question, which would allow the State, in Wife's counsel's words, to "present their case by asking those questions and hearing the Fifth" and to offer testimony "to the jury by the questions they're asking." The court responded that "anything [the State] says isn't evidence, so it doesn't matter." And Wife's counsel responded that the court should not allow it precisely *because* the State's questions would not be evidence. The court disagreed and determined that the State could ask questions and that Wife could invoke her right to every question if she wanted to but she had to testify "if it [had] nothing to do [with a topic] that would incriminate her." The court further determined that Wife's invocation of her Fifth Amendment right could not be invoked in a blanket fashion and that she would have to invoke it for each question, as there may be some she could answer.

¶29   The State argues that regardless of the court's reasoning, the court did not err because Wife waived her privilege by testifying earlier and recanting her story.[4] We note that the State did not make this argument during trial. Alternatively, the State

---

4. Though we make our decision on preservation grounds, it appears the State is correct that a witness cannot testify about a subject and later invoke a Fifth Amendment privilege in order to avoid cross-examination on that same topic. *See Mitchell v. United States*, 526 U.S. 314, 321 (1999); *In re Flint Water Cases*, 53 F.4th 176, 193 (6th Cir. 2022). This issue is addressed further below. *See infra* ¶ 36.

argues that Wife never had the privilege to begin with because the State provided her with immunity.[5]

¶30 Notwithstanding each parties' arguments, our review of the record indicates that Arce did not preserve this issue. It is "well within our prerogative to raise a preservation issue on our own initiative when it provides an alternative basis for

---

5. The State argues that a valid claim of privilege "turns in part on the likelihood of future prosecution." A witness may not "employ the privilege to avoid giving testimony that he simply would prefer not to give," *Roberts v. United States*, 445 U.S. 552, 560 n.7 (1980); instead, the witness must face real—not remote or speculative—dangers, *Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 478 (1972). Therefore, a grant of immunity nullifies the witness's privilege as it forecloses the possibility of subsequent prosecution. *State v. Morris*, 2017 UT App 112, ¶ 18, 400 P.3d 1183, *cert. denied*, 409 P.3d 1049 (Utah 2017). Here, the State argues that while it did withdraw the written immunity offer, the offer was "irrelevant" as the State put on the record several times that it would not seek to have the court hold Wife in contempt for refusing to testify. We do not agree and fail to understand how a promise not to seek to have a trial court hold Wife in contempt is sufficient to rise to the level of granting her "effective blanket immunity," as the State argues. Wife still faced the very real danger of prosecution for perjury, for which the State offered her no protection. Thus, the State did not provide Wife with immunity—either written or through promises not to charge her with contempt—and Wife's Fifth Amendment privilege remained intact. However, the State is likely correct that the right had been waived for subjects about which she freely had already testified. And, as discussed, this issue was not preserved, so there is no need for further consideration of whether allowing the State to continue questioning Wife was an error and, if so, whether there was a reasonable likelihood of a more favorable outcome for Arce absent the questioning.

affirmance, even if the State failed to brief the preservation argument." *State v. Malo*, 2020 UT 42, ¶ 20 n.7, 469 P.3d 982. In *Cook Associates, Inc. v. Warnick*, 664 P.2d 1161 (Utah 1983), our supreme court confronted "[w]hether an objection by one party properly preserves an objection on appeal as to another party." *Id.* at 1164. The supreme court followed what "[v]irtually every other jurisdiction that has considered the question has concluded," which is that "an objection . . . by one or more parties at trial does not inure to the benefit of other parties who do not join in the objection." *Id.* at 1164–65. In *State v. Calliham*, 2002 UT 86, 55 P.3d 573, two brothers charged with murder were tried together. *Id.* ¶¶ 1–3. Following their convictions, one brother (Brother 1) appealed. *Id.* ¶¶ 18–19. As part of his appeal, Brother 1 argued that the trial court's decision to admit specific evidence was an error that violated his constitutional rights. *Id.* ¶ 32. However, our supreme court held that this issue was not preserved for appeal, as it was the other brother (Brother 2) who had objected—an objection which Brother 1 did not join at trial. *Id.* ¶ 33. "[Brother 1] did not join in [Brother 2's] objections on the record or make any objection of his own," thus preventing him from claiming on appeal that it prejudiced him or undermined his constitutional rights. *Id.*

¶31 Similarly, in the case before us, Arce was not the one who objected to Wife taking the stand, knowing she would invoke her Fifth Amendment right for every question—it was Wife's counsel who made the objection. Arce did not join that objection.[6]

---

6. Arce acknowledges that it was Wife's counsel rather than his own who made the objection to Wife taking the stand knowing she would invoke her Fifth Amendment right. Despite this, Arce argues that the issue is preserved by primarily relying on *Kell v. State*, 2012 UT 25, 285 P.3d 1133. But *Kell* is distinguishable from the present case. In *Kell*, the question was whether an issue was preserved when the State opposed a criminal defendant's rule

(continued…)

Therefore, as in *Calliham*, Arce has not preserved the right to now claim on appeal that the court erred in its decision to allow Wife to testify, which in turn allowed the jury to hear her invocations 47 times.[7]

¶32    And the issue needed to be "preserved in order to give the trial court an opportunity to address the claimed error, and if appropriate, correct it." *Kell v. State*, 2012 UT 25, ¶ 11, 285 P.3d 1133 (cleaned up). Here, the trial court had no such opportunity. It is readily evident from our review of the record that the trial court was not focused on the impact these Fifth Amendment issues would have on Arce. Instead, the trial court ruled on this issue through the lens of its impact on Wife. Had Arce objected, the trial court may have fully engaged in an analysis of whether Wife's Fifth Amendment right was waived or abandoned as the State suggests. But Arce made no such objection, and therefore the court engaged in no such analysis.

¶33    "As a general rule, claims not raised before the trial court may not be raised on appeal," and it is "well-established" that this "preservation requirement applies to every claim, including constitutional questions." *Conner v. Department of Com.*, 2019 UT App 91, ¶ 48, 443 P.3d 1250 (cleaned up). Despite Arce's arguments that he preserved this issue, the record does not support his assertions, as "a party must raise [the issue] before the [trial] court specifically, in a timely manner, and with support by evidence and relevant legal authority, such that the issue has been

---

60(b) motion and the criminal defendant did not respond to the State's arguments yet later sought to appeal the decision. *Id.* ¶¶ 9–10. The State and a criminal defendant are not in an analogous adversarial position to the criminal defendant and nonparty witness, Wife, present here. *Kell* is simply inapposite.

7. Arce does not claim the application of any exception to preservation.

presented to the trial court in such a way that the trial court has an opportunity to rule on it." *Id.* (cleaned up). As discussed, the record does not reflect an objection from Arce on the issue but instead from Wife, which did not allow the court to review the issue as it pertains to Arce. Therefore, the issue is not properly preserved, and we do not consider the merits of his claim.

## II. Ineffective Assistance of Counsel

¶34 "To prevail on an ineffective assistance of counsel claim, a defendant must meet the two-prong *Strickland* test: (1) counsel's performance was objectively deficient and (2) the deficient performance resulted in prejudice." *State v. Fleming*, 2019 UT App 181, ¶ 9, 454 P.3d 862 (citing *Strickland v. Washington*, 466 US 668, 687–88 (1984)), *cert. denied*, 462 P.3d 803 (Utah 2020). "[D]eficient performance is not determined in a vacuum; rather, it involves asking whether the strategy [counsel] employed was that of a reasonable, competent lawyer in the real-time context" of a trial. *State v. Wilkes*, 2020 UT App 175, ¶ 24, 479 P.3d 1142, *cert. denied*, 485 P.3d 944 (Utah 2021). "However, even where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient. . . . [T]he ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350. And a defendant establishes prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Gonzalez*, 2021 UT App 135, ¶ 8, 501 P.3d 1205 (cleaned up). "That is, the defendant's showing must undermine our confidence in the outcome." *Id.* (cleaned up). The impact of such alleged errors must "be a demonstrable reality." *Id.* (cleaned up).

¶35 "Because both prongs of the *Strickland* test must be met to establish ineffective assistance of counsel, we need not always

address both prongs." *Fleming*, 2019 UT App 181, ¶ 9 (cleaned up). "And if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice that course should be followed." *Gonzalez*, 2021 UT App 135, ¶ 7 (cleaned up). Given the likelihood that similar events to those of this case can and will arise before the trial courts of this state, we address counsel's alleged deficient performance, although we ultimately determine that Arce's claims fail for lack of prejudice.

A. Deficient Performance

1. Invoking the Fifth Amendment

¶36 In addition to Arce's arguments already discussed above regarding Wife's invocation of her Fifth Amendment right, Arce argues that his counsel acted deficiently by not seeking to limit or remediate the State's continued leading questions and Wife's invocations by objecting, moving to strike both the questions and invocations, or asking for a curative instruction. Based on the reasoning in *Mitchell v. United States*, 526 U.S. 314 (1999), and *In re Flint Water Cases*, 53 F.4th 176 (6th Cir. 2022), competent counsel could reasonably choose not to take any of these actions, as Wife had waived her Fifth Amendment privilege by having voluntarily testified about the matter in question. A "witness . . . may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." *Mitchell*, 526 U.S. at 321. "When the witness testifies, the privilege is waived for the matters to which the witness testifies." *In re Flint Water Cases*, 53 F.4th at 193 (cleaned up). Thus, Arce's counsel, and correspondingly the trial court, could have concluded that Wife did not have the right to invoke the privilege. Therefore, we determine that Arce fails to show deficient performance.[8]

---

8. Arce points to *State v. Bond*, 2015 UT 88, 361 P.2d 104, for us to consider. But *Bond* is not particularly helpful here. The witness in

(continued…)

¶37    Arce claims his counsel should have objected and pointed the court to rule 403 (excluding evidence which is substantially more prejudicial than probative), rule 510(c) (disallowing comment by a judge or counsel about, or a factfinder making an inference from, the invocation of a privilege), or rule 611(a) (allowing a court to control the examination of witnesses so as to avoid wasting time or the harassment or embarrassment of a witness) of the Utah Rules of Evidence. Arce makes no effort, however, to provide us with the context of Wife's 47 invocations or the depth of her earlier testimony.[9] While Arce discusses Wife's trial testimony prior to the court's interruption to allow her to consult her counsel, he provides the court no comparison of that testimony with the subject matter of the questions asked on cross-examination when she began invoking the Fifth Amendment. As a result, the briefing leaves us with no understanding about

---

*Bond* did not attempt to invoke his Fifth Amendment privilege to avoid answering a question regarding a subject about which he had testified previously. *Id.* ¶ 10. Also, the analysis in *Bond* must be viewed in context. In *Bond*, the Utah Supreme Court was reviewing the denial of a motion for a mistrial—a trial court decision reviewed under an abuse of discretion standard—and an allegation of prosecutorial misconduct. *Id.* ¶¶ 13, 22. Thus, unlike the case before us, *Bond* does not address these issues as evidentiary rulings.

9. We acknowledge that Arce has appended a transcript containing the invocations to his brief. But beyond the appendix, Arce's brief makes no attempt to address the context of the invocations—referring to them only as a whole rather than providing any information as to the subject matter of the questioning that provoked them. Arce does not attempt to explain, for example, if one, two, or three questions might be permissible. Neither does he explain at which point the line would have been crossed to render his counsel's inaction objectively unreasonable.

whether all 47 invocations were directly addressing matters about which Wife had already testified—particularly her recantation. Assuming the questions were simply cross-examination of statements made earlier in trial, Arce's counsel would have no basis for an objection because the privilege would be waived. Furthermore, without an understanding of the depth of Wife's earlier testimony, we cannot gauge whether 47 invocations corresponded in an impermissible or potentially prejudicial way to Wife's prior trial testimony. Within the confines of the briefing provided to us, we cannot fault Arce's counsel for failing to object or make other efforts to limit the testimony.

¶38    Given that there is an obvious basis to believe that Wife no longer possessed a Fifth Amendment privilege and where the briefing does not delineate any context for the questions for which the privilege was invoked, Arce has not overcome the presumption that his counsel acted reasonably, and we cannot conclude that Arce's counsel was objectively deficient in his representation. *State v. Hart*, 2020 UT App 25, ¶ 20, 460 P.3d 604 (stating that to prove deficient performance a defendant must overcome a "strong presumption that his trial counsel rendered adequate assistance" (cleaned up)), *cert. denied*, 462 P.3d 805 (Utah 2020). We acknowledge that there certainly could be circumstances where compelling a witness to invoke a privilege 47 times would be troubling, but we can reach no conclusion about counsel's failure to object to these questions here.

2.    Witness Opining and Vouching

¶39    Arce further argues that his counsel performed deficiently by failing to object to Deputy opining on and vouching for the credibility of Wife's statement the night of the incident. Rule 608(a) of the Utah Rules of Evidence "permits testimony concerning a witness's general character or reputation for truthfulness or untruthfulness but prohibits any testimony as to a witness's truthfulness on a particular occasion." *State v. King*, 2010

UT App 396, ¶ 44, 248 P.3d 984 (cleaned up); *see also State v. Adams*, 2000 UT 42, ¶ 19, 5 P.3d 642 (detective testifying "he did not believe [the victim] was coached" was inadmissible vouching); *State v. Jones*, 2020 UT App 161, ¶ 14, 478 P.3d 1055 (per curiam) ("[A]dmission of testimony that bolsters the credibility of another witness's testimony on a particular occasion is improper."); *id.* ¶ 18 (officer testifying regarding interview techniques for domestic violence victims did not violate rule 608 because he did not opine on the victim's truthfulness on a particular occasion); *State v. Lewis*, 2020 UT App 132, ¶ 26, 475 P.3d 956 (police sergeant describing variations he sees in victims' statements when multiple accounts are given was not bolstering, as "he did not directly opine on [the victim's] credibility"); *State v. Cegars*, 2019 UT App 54, ¶¶ 23–24, 440 P.3d 924 (school counselor testifying that she did not believe the victim would fabricate allegations was inadmissible bolstering); *State v. Vail*, 2002 UT App 176, ¶¶ 15, 17, 51 P.3d 1285 (detective testifying that two victims of child sexual abuse "exhibited the indicators that she equated with trustworthiness" was inadmissible bolstering); *State v. Stefaniak*, 900 P.2d 1094, 1095 (Utah Ct. App. 1995) (social worker testifying that a victim of abuse "seemed to be quite candid" in an interview was inadmissible vouching (cleaned up)). For example, an officer cannot comment on whether a witness appeared "to be genuine" during an interview, as it is a direct comment on the witness's truthfulness and clearly violates rule 608. *State v. Bragg*, 2013 UT App 282, ¶ 31, 317 P.3d 452 (cleaned up). We emphasize again today that the State's use of a law enforcement officer's testimony for bolstering and vouching in this manner is inappropriate. We perceive no strategic reason that Arce's counsel would reasonably fail to object to this testimony.

¶40　　But even so, Arce can prevail only if he establishes both deficient performance and prejudice. And for the reasons set forth in Part II.B, we conclude that he was not prejudiced by this deficient performance.

3.      Referring to Wife as "the Victim"

¶41     Finally, Arce argues that his counsel performed deficiently by failing to object to the State and witnesses referring to Wife as "the victim" 29 times in front of the jury. Our supreme court "recognize[s] the gravity of referring to witnesses as victims during a trial." *State v. Vallejo*, 2019 UT 38, ¶ 102, 449 P.3d 39. In cases, such as the one before us, "where a defendant claims that the charged crime did not actually occur, and the allegations against that defendant are based almost exclusively on the complaining witness's testimony—the trial court, the State, and all witnesses should be prohibited from referring to the complaining witness as 'the victim.'" *State v. Devey*, 2006 UT App 219, ¶ 17, 138 P.3d 90. Though in this case we do not exclusively rely on such testimony because there was a "sort of reddish mark" on Wife's collarbone and Arce told Deputy there was "some pushing and shoving," we still restate today that the action of referring to the complaining witness as "the victim" by anyone in front of the jury is inappropriate. Again, we perceive no strategic reason that Arce's counsel would reasonably fail to object to this testimony.

B.      Prejudice

¶42     Ultimately, Arce has not shown that any of these alleged errors prejudiced him. There is not a reasonable probability that but for Arce's counsel failing to object further to the State's questioning of Wife, moving to strike, or asking for a curative instruction, the result of Arce's trial would be different. As mentioned, the jury heard testimony from four witnesses, each of whom told the same story, namely, that Wife said Arce hit and choked her that night. The testimony of these four witnesses matched Wife's own words in the statement she gave to Detective. Furthermore, the reason Wife provided to Deputy for dismissing the charges was not that she had lied but that she needed Arce to keep his job as well as his help with their children. As we point

out above, even Arce in his statement to Deputy admitted there was "some pushing and shoving," which is inconsistent with Wife's recantation. And Arce did not explicitly deny that he hit, kicked, or choked Wife, instead stating only that he could not recall doing so. Most reasonable jurors would think that physical assault is something that one would remember having committed. Furthermore, and perhaps most convincingly, Wife's own statement to Detective was entered into evidence for the jury to read. In short, finding that none of these alleged errors undermines our confidence in the outcome of this case, each of Arce's claims of ineffective assistance of counsel fails for lack of prejudice. Moreover, because none of these alleged errors were sufficiently prejudicial alone, we, for the same reason, conclude that the errors do not cumulatively undermine our confidence in the outcome of the trial.[10]

CONCLUSION

¶43   Arce's claim that the court erred by allowing the State to repeatedly compel Wife to invoke her Fifth Amendment privilege in front of the jury fails because the issue was not preserved. Furthermore, Arce's claims of ineffective assistance of counsel fail because his counsel's failure to object to Wife's invocations, Deputy's vouching for Wife's credibility, and repeated references to Wife as "the victim" do not present a reasonable probability that but for Arce's counsel's failure the result of the proceeding would have been different. We therefore affirm Arce's convictions.

———————

10. "The cumulative-error doctrine requires us to reverse if (1) we determine, or assume without deciding, that two or more errors occurred and (2) we determine that the cumulative effect of those errors undermines our confidence that a fair trial was had." *ConocoPhillips Co. v. Utah Dep't of Transp.*, 2017 UT App 68, ¶ 30, 397 P.3d 772.