**2025 UT App 152**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RICHARD MATTHEW BARLOW,
Appellant.

Opinion
No. 20230477-CA
Filed October 23, 2025

First District Court, Brigham City Department
The Honorable Brandon J. Maynard
No. 221100346

Freyja Johnson, Hannah Leavitt-Howell, and
Mikayla Irvin, Attorneys for Appellant

Derek E. Brown and Alexandra Herlong,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

MORTENSEN, Judge:

¶1      Richard Matthew Barlow and his friend Steve[1] stole some scooters. Barlow believed that Steve subsequently stole one of those same scooters from him. Obviously unable to go to the police, Barlow took the matter into his own hands. Armed with a handgun and donning a ski mask, he went to confront Steve and James, another acquaintance, about the allegedly stolen scooter. After a brief argument, Barlow shot both men and left them to die.

---

1. We use pseudonyms for the non-parties mentioned in this opinion.

James managed to call the police for help, and both men survived, though Steve was left with paraplegia.

¶2 Barlow was convicted on two counts of attempted murder and three counts of felony discharge of a firearm with serious bodily injury. Barlow appeals his convictions, arguing that his trial counsel (Counsel) was ineffective in (1) not requesting a jury instruction on imperfect self-defense when the evidence overwhelmingly suggested that Barlow's use of force was not legally justified and (2) not cross-examining Steve about an immunity agreement he secured in exchange for his testimony. We find no merit in either of Barlow's arguments and therefore affirm.

BACKGROUND[2]

*The Shootings*

¶3 Barlow and Steve had been friends for at least four years. One day, the two men stole some scooters and e-bikes together and left a couple of them at Barlow's apartment.[3] Later that same day, Barlow saw a man he believed was Steve take one of the scooters by the apartment and ride off. Barlow called Steve and left him an angry voicemail:

---

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up).

3. For the reader's ease, and because the distinction does not affect our analysis, we refer to the scooters and e-bikes interchangeably as scooters.

> Hey, so someone came through and took one of the scooters. So I'm just gonna let you know before I find out it's you, your ass is a target. I don't give a fuck. I'm just saying that shit, 'cause right now I'm going down and asking the motherfucker with the cameras here that's at my apartment and see the dumb motherfucker that just took it. And then I'm headed for their asses, so I hope to God it's not you, bro. Otherwise, you're fucked. And because they have camera footage, your ass is gonna get in hot fuckin' water, so I ain't, n****. You don't fucking do dumbass little shit like that to me (inaudible). I'm not blaming you, but you're the only motherfucker that knows that shit was there, so you better fuckin' respond, otherwise I'm gonna think it's you and I will head that way.

Barlow then asked the apartment manager (Manager) if he had video footage of the apparent theft. Manager said that he did not and suggested that Barlow file an insurance claim. Ignoring the suggestion for obvious reasons, Barlow told Manager he was "going to get [his] gun and go fuckin' shoot somebody or shoot those fuckers." Barlow then called Steve again and left another voicemail: "You should respond quick because I'm headed your way, and if I catch you with what I think you took, I ain't gonna talk, my n****."

¶4     Barlow believed that Steve was at a nearby warehouse. He also thought James would probably be there. Armed with a 9mm handgun fitted with a laser sight, Barlow went to the warehouse. Steve and James were listening to music and drinking beer inside the warehouse and were startled when someone pounded on the door. Steve opened the door and saw a figure wearing a ski mask. When the figure spoke, Steve recognized Barlow's voice and told James that Barlow was there. Barlow then removed the mask.

¶5    Barlow started waving the gun around and accused Steve and James of stealing from him. Steve, who was unarmed, tried to de-escalate the situation. He assured Barlow that he was merely charging the scooter and would return it to him. He also asked Barlow if he was really going to shoot him, given their years-long friendship. Steve eventually told Barlow not to "threaten [him] with a good time" and to "do it then." Barlow then shot Steve once from five to ten feet away.

¶6    James was also unarmed. He was looking for a place to urinate when he heard the gunshot. At that point, James was ten to twenty-five feet away from Barlow and Steve. James then took a step or two toward both men before Barlow shot him twice.

¶7    Steve initially told Barlow to call the police for help but changed his mind. James yelled to Barlow that he would be a "dick" if he left them to die. Barlow then fled the scene without helping the two men.

¶8    James managed to call the police. At some point after the police arrived, Steve identified Barlow as the shooter. He also told the officers where Barlow lived and that Barlow used a "9mm" in the shooting.

¶9    Paramedics arrived and took Steve and James to the hospital. Both men survived, but Steve was paralyzed from the waist down. James also suffered significant injuries.

*The Investigation*

¶10    Police officers took Barlow into custody. At the police station, a detective (Detective) questioned Barlow about the day's events. Barlow told Detective that his backpack and some of his other belongings had been stolen. Barlow also acknowledged that he had "cruise[d] over past [the] warehouse," but he told Detective that he did not go inside.

¶11 During the conversation, Barlow also told Detective that he had a 9mm handgun. After this disclosure, Detective told Barlow that the police had found shell casings at the warehouse. Barlow acknowledged that officers would find his gun and match the casings to it. Indeed, officers found the gun during a search of Barlow's apartment.

¶12 At this point in the interview, Barlow grew more forthcoming about what happened. He claimed that Steve was "screaming" at him and that Steve and James were both approaching him aggressively. Barlow also said that Steve's friends (presumably including James) were "all like heroin and meth addicts," which he suggested added to his fear in the moment. Barlow ultimately told Detective that he shot Steve and James in self-defense.

¶13 The State charged Barlow with two counts of attempted murder, three counts of felony discharge of a firearm with serious bodily injury, and one count of carrying a concealed dangerous weapon.[4]

*The Pretrial Proceedings*

¶14 Before trial, Steve agreed to testify against Barlow in exchange for the State's promise not to use any information that Steve divulged in a potential criminal proceeding against him.[5]

---

4. The State dropped the concealed weapon charge on the first day of trial.

5. The agreement was one for "use immunity," which "prohibits any prosecutorial use of a witness's testimony or evidence gained from it against the witness." *State v. Arce*, 2024 UT App 43, ¶ 12 n.2, 547 P.3d 235 (cleaned up), *cert. denied*, 554 P.3d 924 (Utah 2024).

¶15   For his part, Barlow moved for a justification hearing pursuant to section 76-2-309(3) of the Utah Code seeking to dismiss the case. He was the only witness to testify at the hearing and claimed he shot Steve and James only after they rushed at him from different angles. Barlow testified that he always carried the gun and that he wore the mask to hide his face from James. Moreover, Barlow suggested that, based on past experience, Steve and James were dangerous when they were using drugs. And he believed the two men had been "heavily intoxicated by drugs, whether it be pills or meth[,]" at the time of the shootings.

¶16   On cross-examination, Barlow testified that he "could barely see" Steve and James because "[i]t was the middle of the night, basically." He also claimed that the two men "were raging at [him]" and "would have killed [him] with how they came out." Nonetheless, Barlow conceded that he could not tell whether Steve and James were carrying weapons.

¶17   The district court found that Barlow had not established a prima facie justification defense and that, even if he had, the State had shown by clear and convincing evidence that his use of force was not legally justified. Consequently, the court denied the motion to dismiss.

*The Trial*

¶18   The case proceeded to trial. During the State's case in chief, Steve, James, Detective, and Manager testified about the shootings and the surrounding events as described above. On cross-examination, Counsel did not ask Steve about his use-immunity agreement.

¶19   Barlow testified in his own defense. His testimony was largely consistent with his testimony from the justification hearing and with what he had told Detective.

¶20  The State then recalled Steve and James in rebuttal. The prosecutor offered medical records showing that both men tested negative for various drugs, including methamphetamine, on the day of the shootings.[6]

¶21  Barlow initially asked that the jury be instructed on perfect self-defense and the lesser included offense of aggravated assault. Before the case was submitted to the jury, however, Barlow withdrew his request for the aggravated-assault instruction. Over the objection of the State, the district court found that there was enough evidence to allow the self-defense instruction to go to the jury.

¶22  The jury convicted Barlow on all counts. The court merged the unlawful discharge counts with the attempted murder counts and sentenced Barlow to two consecutive terms of three years to life.

¶23  Barlow timely appeals, asserting two claims of ineffective assistance of counsel.

ISSUES AND STANDARD OF REVIEW

¶24  On appeal, Barlow argues that Counsel provided ineffective assistance by (1) not requesting a jury instruction on imperfect self-defense and (2) failing to cross-examine Steve about his immunity agreement. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant

---

6. Nonetheless, Steve's blood tested positive for 80 mg of ethanol (which is equivalent to a .08% blood alcohol level), and he had an "abnormal" cannabinoid test. James's blood apparently was not tested for ethanol, but he did concede that he "was intoxicated" on the night of the shootings.

was deprived of the effective assistance of counsel as a matter of law." *State v. Gonzalez*, 2021 UT App 135, ¶ 6, 501 P.3d 1205 (cleaned up).

ANALYSIS

¶25 "To prevail on an ineffective assistance of counsel claim, a defendant must meet the two-prong *Strickland* test: (1) counsel's performance was objectively deficient and (2) the deficient performance resulted in prejudice." *State v. Fleming*, 2019 UT App 181, ¶ 9, 454 P.3d 862 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). And "because both prongs of the *Strickland* test must be met to establish ineffective assistance of counsel, we need not always address both prongs." *Id.* (cleaned up).

¶26 For the first prong, a defendant must establish that counsel's representation was not "within the wide range of reasonable professional assistance." *State v. Wilkes*, 2020 UT App 175, ¶ 24, 479 P.3d 1142 (cleaned up). And a court does not assess deficient performance "in a vacuum." *Id.* Instead, the court must "ask[] whether the strategy counsel employed was that of a reasonable, competent lawyer in the real-time context of a trial." *State v. Arce*, 2024 UT App 43, ¶ 34, 547 P.3d 235 (cleaned up), *cert. denied*, 554 P.3d 924 (Utah 2024). "[T]he ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶27 As for the second prong, "a defendant must show . . . a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Gonzalez*, 2021 UT App 135, ¶ 8, 501 P.3d 1205 (cleaned up). And "the impact of such alleged errors must be a demonstrable reality." *Arce*, 2024 UT App 43, ¶ 34 (cleaned up). Stated otherwise, "the defendant's showing must undermine our confidence in the outcome." *Id.* (cleaned up).

## I. Jury Instruction

¶28 Barlow argues that Counsel should have requested a jury instruction on imperfect self-defense based on the facts of the case. "Imperfect self-defense is a partial justification" and applies "when a defendant reasonably, but mistakenly, believes that the circumstances provide[] a legal justification or excuse for the use of deadly force." *State v. Silva*, 2019 UT 36, ¶ 25, 456 P.3d 718 (cleaned up). When successfully invoked, the defense "reduces murder to manslaughter [and] attempted murder to attempted manslaughter." *State v. Low*, 2008 UT 58, ¶ 22, 192 P.3d 867. By contrast, "perfect self-defense is a complete justification and bars a conviction. It applies when a defendant reasonably believes that unlawful force against him is imminent and he is legally justified in using force to defend himself." *Silva*, 2019 UT 36, ¶ 25 (cleaned up).

¶29 Barlow argues that Counsel's failure to request the instruction constituted deficient performance for at least three reasons. First, he asserts he was entitled to the instruction and that Counsel's alleged failure therefore prevented the jury from being fairly instructed on the law related to self-defense and attempted murder. Second, Barlow maintains that ample evidence showed he was not legally justified in shooting Steve and James, so competent counsel would not have forgone an instruction on imperfect self-defense in his case. Third, he claims that the lack of an instruction on imperfect self-defense effectively reduced the State's burden because the State did not have to disprove the defense beyond a reasonable doubt.

¶30 In response, the State characterizes Counsel's decision not to request the imperfect self-defense instruction as an "all-or-nothing" strategy of not asking for an instruction on a lesser included offense. According to the State, if Counsel would have requested the imperfect-self-defense instruction, then the jury

would have had the "out" of convicting Barlow on a lesser included offense instead of acquitting him.

¶31   We need not address the parties' deficient-performance arguments on this claim, however, because Barlow has not demonstrated that he was prejudiced by Counsel's performance.

¶32   Barlow asserts that Counsel's performance prejudiced him because, "even though the jury rejected *perfect* self-defense, there is a reasonable likelihood that the jury would have questioned whether the State disproved *imperfect* self-defense beyond a reasonable doubt." Barlow suggests that the jury could have found reasonable doubt because he was outnumbered in a dark area by two men who were acting erratically and the dispute "sudden[ly] escalat[ed] from talking to an impending attack from the two men."

¶33   We disagree. Counsel's failure to request the instruction does not undermine our confidence in the outcome because, even if the instruction had been given, it is quite unlikely that the jury's verdict would have been different. *See State v. Ramos*, 2018 UT App 161, ¶ 30, 428 P.3d 334 ("[J]ust because there was enough evidence to justify giving the imperfect-self-defense instruction does not mean that the jury would have found that it applied."). After seeing Steve take the scooter, Barlow left him two extremely threatening voicemails. Barlow also told Manager he was going to shoot the people who stole his scooter. He tracked Steve and James down and angrily confronted them while he was armed with a 9mm handgun fitted with a laser sight. Moreover, Steve and James testified that they were unarmed, and even Barlow conceded that he could not tell whether the two men were armed when he confronted them. Finally, Barlow shot James from at least ten feet away and shot Steve from between five and ten feet away. On these facts, we are not convinced there is a reasonable probability that the jury would have done anything other than convict Barlow of attempted murder had Counsel successfully

requested the imperfect-self-defense instruction. *Cf. State v. Garcia*, 2017 UT 53, ¶ 45, 424 P.3d 171 (concluding that the defendant was not prejudiced by an erroneous jury instruction on imperfect-self-defense because the evidence that the defendant "was motivated by a desire to kill . . . overwhelmed the evidence that [the defendant] acted in imperfect self-defense"). Therefore, Barlow's first ineffective-assistance claim falls short.

## II. Steve's Use-Immunity Agreement

¶34    Barlow argues that Counsel provided ineffective assistance by failing to introduce evidence of Steve's use-immunity agreement. This claim fails for lack of deficient performance.

¶35    Barlow argues that Steve's "credibility was a key element of the State's case." Consequently, he argues, Counsel's failure to introduce evidence of Steve's use-immunity agreement enabled the State to offer the "narrative that [Barlow] pursued vigilante justice by shooting [Steve] and [James], rather than acting in self-defense." According to Barlow, that narrative depended "on [Steve's] account of [Barlow and Steve's] purported criminal activity, for which [Steve] had immunity." The problem with the argument is that Steve's use-immunity agreement related to his and Barlow's thefts of the scooters, not to the shootings. We fail to see how the thefts could have affected Steve's credibility with the jury, given that he openly testified about committing those unrelated crimes. In fact, as a practical matter, the jury may well have inferred based on Steve's testimony that he had some form of immunity. And it bears noting that use immunity is a relatively weak form of immunity in that it "does not prohibit a subsequent prosecution based on independent evidence." *State v. Ward*, 571 P.2d 1343, 1347 (Utah 1977) (Wilkins, J., dissenting).

¶36    Moreover, given that Steve's use-immunity deal was based on relatively minor crimes, Counsel had a clear strategic reason not to introduce the use-immunity deal: Barlow admitted shooting Steve, who now must use a wheelchair due to paralysis.

Bringing up the agreement could have caused the jury to think Counsel was unnecessarily attacking a sympathetic victim and thereby undermined Barlow's defense.

¶37 In short, the use-immunity agreement was based on crimes unrelated to the charges on which Barlow was ultimately convicted. And bringing up the agreement could have made the jury less sympathetic to Barlow. For these reasons, Counsel's failure to ask Steve about the use-immunity agreement was not objectively unreasonable. Barlow's second claim for ineffective assistance therefore also misses the mark because Counsel was not deficient in failing to question Steve about the agreement.

CONCLUSION

¶38 Barlow has not demonstrated that Counsel's failure to request a jury instruction on imperfect self-defense was prejudicial, because even if the jury had been so instructed, we are confident that he would have been convicted. Moreover, Counsel's apparent decision not to introduce evidence of Steve's use-immunity agreement was not deficient, because Steve's unrelated crimes were irrelevant to his credibility in this case and because introducing the evidence would have risked making the jury less sympathetic to Barlow.

¶39 Affirmed.

_____